**NORTH AMERICAN PRODUCTS CORPORATION, Plaintiff,**

v.

**Michael J. MOORE and Tru–Cut, Defendants.**

No. 5:01CV193OC10GRJ.

United States District Court,
M.D. Florida,
Ocala Division.

April 2, 2002.

Theresa M. Gallion, Anthony J. Hall, Orlando, FL, for Plaintiff.

Alan M. Gerlach, Jr., Ford & Harrison, LLP, Orlando, FL, for Defendants.

### ORDER GRANTING PRELIMINARY INJUNCTION

HODGES, District Judge.

The Plaintiff's motion for a temporary restraining order and preliminary injunction (Doc. 20) was referred to the United States Magistrate Judge (Doc. 23) to conduct such proceedings as necessary to the making of a report and recommendation concerning the matter.

After full briefing, the submission of evidentiary materials, and a hearing, the Magistrate Judge issued his Report and Recommendation (Doc. 42) suggesting to the Court that the Plaintiff's motion should be Granted in part and Denied in part, and that a preliminary injunction should issue against the Defendants.

Both sides have filed objections to the Report and Recommendation (see Docs. 43, 44, 45 and 46). The Defendants object to the granting of any injunctive relief while the Plaintiff's objections center upon the length of operative period of the recommended preliminary injunction and the amount of the injunction bond to be required.

Upon de novo review of the record and due consideration of the parties' objections, the Court has determined that the objections should be overruled (except in

one respect) and that the thorough and well reasoned Report and Recommendation of the Magistrate Judge should be adopted and confirmed except for the term or length of the preliminary injunctive relief to be granted.[1]

It is, therefore, ORDERED AND ADJUDGED:

1. The Plaintiff's motion for a preliminary injunction (Doc. 20) is GRANTED to the extent provided in paragraphs 2 and 3 below, and is otherwise DENIED.

2. The Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are hereby preliminarily restrained and enjoined from directly or indirectly soliciting business involving the maintenance, repair or sale of tools, including cutting tools, from any customers of North American Products Corporation within the State of Florida and with which Michael J. Moore made sales efforts while employed by North American Products Corporation in the year prior to April 1, 2001.

3. This preliminary injunction shall be effective upon the filing by the Plaintiff of a surety bond in the amount of $500,000 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained by this Order,

and shall then continue in effect pending further Order of the Court but not to exceed 360 days from the date of this Order.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION [1]

JONES, United States Magistrate Judge.

Pending before the Court on an Order of Reference (Doc. 23) are Plaintiff's Motion For Temporary Restraining Order And Preliminary Injunction [2] (Doc. 20) and Plaintiff's Memorandum Of Law In Support Of Motion For Temporary Restraining Order And Preliminary Injunction. (Doc. 21.) Defendant filed its memorandum in opposition to the application for preliminary injunction (Doc. 28).

As evidence in support of its request for a preliminary injunction Plaintiff, North American Products Corporation ("NAPCO"), has filed the following: (1) a copy of a North American Products Corporation Employment Agreement—Production Employment, Executed by Michael J. Moore ("Moore") and NAPCO in 1991 (the "1991 Employment Agreement") [3]; (2) a NAPCO Employment Agreement—Sales Personnel, executed by Moore and NAPCO in 1998 (the "1998 Employment Agreement") [4]; (3) Articles of Incorporation of Tru–Cut, Inc. ("Tru–Cut") [5]; (4) Affidavit of Michael Epstein [6]; (5) Affidavit of Roy

---

1. The Court will extend the term of the relief for the reasons stated, and on the basis of the authorities cited, in the Plaintiff's objections (Doc. 43).

1. Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

2. On November 9, 2001 (Doc. 23) the Court denied that portion of Plaintiff's motion requesting a temporary restraining order and referred to the undersigned the application for preliminary injunction.

3. Doc. 22, Ex. 1.

4. *Id.,* Ex. 2.

5. *Id.,* Ex. 3.

6. *Id.,* Ex. 4.

King[7] (6) Affidavit of Judy Haven[8]; (7) Affidavit of Keith Lewallen[9]; (8) Affidavit of Milford Keene[10]; (9) Deposition of Moore[11]; (10) Deposition of Horst Riese[12]; (11) Deposition of Carl Hopkins[13]; (12) Deposition of John Bennett[14]; and (13) April 2001 invoices from Tru–Cut to various customers.[15]

In opposition to the request for a preliminary injunction the Defendants filed (1) the affidavit of Moore, dated November 19, 2001; (2) the affidavit of Lucian Myers; (3) the affidavit of John Bennett[16]; and (4) the deposition transcript of Lucian Myers.[17]

A hearing limited to argument of counsel was held on November 27, 2001 and, the parties were permitted to supplement the record after the hearing on several selected issues.[18] In addition—after the hearing and with the Court's permission—the Plaintiff filed (1) a 1997 employment agreement, that had only just been located and (2) copies of management and profile documents submitted by Defendant to Bank of America in February 2001 in or-der to obtain financing for Tru–Cut.[19] Lastly, and most recently on January 10, 2002, NAPCO filed supplemental authority regarding Defendant Moore's material breach defense. (Doc. 38.) Accordingly, the matter is now ripe for resolution. For the reasons discussed below, NAPCO's Motion For Preliminary Injunction is due to be **GRANTED in part** and due to be **DENIED in part.**

## I. BACKGROUND FACTS

Moore began working with NAPCO as a Shipping Clerk on September 2, 1986. NAPCO has been in the business of manufacturing, selling, distributing and repairing various tools, including cutting tools. During Moore's approximate fifteen years of employment with NAPCO he was promoted from shipping clerk to various positions[20] until he was appointed on January 25, 1996 to the position of Florida Service Center Manager. Subsequently, Moore switched from the production side of the business to sales, when he was appointed to be a tooling representative on April 23,

---

7. *Id.,* Ex. 5.

8. *Id.,* Ex. 6

9. *Id.,* Ex. 7.

10. *Id.,* Ex. 8.

11. *Id.,* Ex. 9. (Volumes I and II)

12. *Id.,* Ex. 10.

13. *Id.,* Ex. 11.

14. *Id.,* Ex. 12.

15. Doc. 29. Pursuant to a stipulation between the parties these invoices were stipulated to be authentic and documents used and produced in the course of Tru–Cut's business. (Doc. 33.)

16. Doc. 26.

17. Doc. 27.

18. At the conclusion of the hearing the Court agreed to hold the record open and permitted the Plaintiff to file a supplemental affidavit limited to whether Moore was owed any monies. Defendants were given 10 days thereafter to respond. Thereafter the Defendants filed the affidavit of Trudi Moore, directed to the dates on the Tru–Cut invoices. (Doc. 31.) On December 7, 2001 NAPCO filed the affidavits of David Smith and Carl Hopkins (Doc. 34) on the issue of compensation owed to Moore. Defendants filed the affidavit of Moore with supporting documentation (Doc. 37) in response to NAPCO's affidavits concerning the issue of whether Moore is owed any monies by NAPCO.

19. Doc. 35.

20. On April 4, 1990 he was promoted to side grinder. Thereafter he was promoted to Quality Control Inspector (September 1, 1990) and then to Assistant Service Center Manager. (May 28, 1991).

1997. Moore continued in sales as a tooling representative until April 1, 2001, when he resigned without notice to pursue the tool cutting repair business as an employee and owner of Tru–Cut.

During Moore's tenure at NAPCO he executed at least three employment agreements. The first agreement was executed on or around May 28, 1991 incident to Moore's promotion to Assistant Service Center Manager.[21] The 1991 Agreement contained a covenant not to compete[22], a clause prohibiting solicitation of customers, while employed, and a clause prohibiting disclosure of confidential information.

In 1997, when Moore requested and received a transfer to a sales position covering a territory in the Central and North Florida areas, another employment agreement was executed (the "1997 Agreement").[23] The 1997 Agreement also contains a non-solicitation clause as well as a clause prohibiting disclosure of confidential technical and sales information. The 1997 Agreement—unlike the 1991 Agreement— does not contain a blanket noncompete clause for a large geographical area, but rather contains a clause only prohibiting solicitation of customers with whom Moore had sales contact within the State of Florida, during the year preceding termination. The restriction is limited to a period of 360 days after termination as opposed to the 1991 Agreement, which provides for a restriction for 270 days after termination and broadly limits any involvement in a competing business.

On Sunday, April 1, 2001 Moore resigned his employment with NAPCO and immediately engaged in a competing business with NAPCO, as president of Tru–Cut, a Florida corporation formed on January 16, 2001. Although Moore conveyed his ownership interest in Tru–Cut to his wife in August, 2001, after this case was filed, it is not disputed that Moore functions as the chief executive officer of Tru–Cut and as such is the person ultimately responsible for the business operations of Tru–Cut.[24] Prior to April 1, 2001, John Bennett ("Bennett"), a former NAPCO employee, served as head of sales for Tru–Cut. Prior to Moore's termination of employment, Bennett organized Tru–Cut's new plant, ordered and placed equipment in the plant and began to formulate a sales strategy to market to NAPCO's customers.[25]

---

**21.** Doc. 22, Ex. 1.

**22.** Pursuant to the non-compete clause Moore was prohibited from being involved, either directly or indirectly, with a business involved in repairing cutting tools for 270 days from termination within Florida, Georgia, North Carolina, South Carolina or New York.

**23.** At the hearing on November 27, 2001 both parties referred to a May 1998 Agreement (Doc. 22, Ex. 2). Subsequent to the hearing the Plaintiff filed an identical agreement dated April 23, 1997, which had been produced in discovery but had not been identified at the hearing or referred to in the parties' briefings. The only difference between the 1997 Agreement and the 1998 Agreement is the identity of the party who executed the agreement on behalf of NAPCO and the territory covered by the agreements. Although the 1997 Agreement prohibits solicitation of customers in Florida, Georgia, Alabama and South Carolina the 1998 Agreement is limited to the State of Florida. While NAPCO's argument that the fact that the 1997 Agreement was executed by a different representative from the 1998 Agreement, may be significant with regard to resolution of the defense of novation, as explained later, the Court does not need to determine this issue at this stage of the proceedings. For purposes of this motion it is not disputed that the provisions of both agreements are identical (other than the territory covered by the agreement) and that the 1997 Agreement was executed in consideration for Moore's new job in the sales department as a tooling representative.

**24.** Doc. 22, Ex. 9, pg. 14.

**25.** *Id.*, Ex. 12, pgs. 9–12; Ex. 9., pg. 248.

Moore, himself, began making preparations to form, outfit and finance Tru–Cut months prior to his departure from NAPCO. Notably, Moore arranged bank financing, the purchase of equipment, arranged the lease of property, retained a lawyer to draft incorporation documents and issue shares in Tru–Cut and developed Tru–Cut's business plan over the first two months of 2001.[26] For example, on February 23, 2001—six weeks prior to Moore's termination from NAPCO—Moore submitted an application to Bank of America for financing for Tru–Cut.[27] As part of the loan process, Moore listed at least five of NAPCO's customers as "key customers" of Tru–Cut.

After April 1, 2001 NAPCO was notified by several customers that a Tru–Cut representative had contacted them to solicit their business. As of the date of the hearing Tru–Cut is servicing or has serviced a number of customers from Moore's former territory.[28]

Moore alleges that he is still owed various monies by NAPCO. These monies include: (1) approximately $120.00 for unreimbursed out of pocket cash expenses incurred by Moore prior to his termination on April 1, 2001, (2) $1,823.36 for commissions for March 2001 sales, and (3) $160.00 for commissions on sales made on April 1, 2001 for a total sum of $2,103.36.[29] NAP-CO disputes that Moore is owed any monies. According to NAPCO there is no contractual commitment to pay Moore sales commissions after termination. Instead, NAPCO contends that in October 1997 Moore made the transition to compensation based on "a base salary plus a percentage on sales made in the prior month." [30] Under NAPCO's calculations and interpretation of Moore's compensation arrangements Moore's final pay was calculated and paid correctly. Further, NAPCO avers that Moore has been reimbursed in full for all expenses submitted by Moore.

## II. PRELIMINARY INJUNCTION STANDARD

The preliminary injunction is an "extraordinary and drastic remedy" that should only be granted where the movant carries the burden of persuasion as to the following four prerequisites: (1) substantial likelihood of success on the merits, (2) that there is a substantial threat plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may cause to the defendant, and (4) that granting the preliminary injunction will not be adverse to the public interest.[31] The Court will address each of these prerequisites in turn.

---

**26.** *Id.*, Ex. 9, pg. 38, 250–53.

**27.** Doc. 36.

**28.** These include: Premedor, Unicor Federal Prison, Doorcraft of Florida, Temple Terrace Industries, Universal Forest Products, Sunbelt Forest Products, AMC Industries, Locklando Door and Millwork, Screw Machine Precision, Alro Metal Service, Tee Pee, Inc., Spartech Marine, Stark Truss, Inc., Forest Products, Metal Industries, Suncoast Window Treatments, and Worldwide Door Components. (Doc. 22, Ex. 9, pgs, 105–106, 109, 118, 122–123, 127, 130, 132, 143, 143–148, 165–166, 168–170, 172, 189, 191, 196–200).

**29.** Doc. 37, ¶¶ 6, 7, 11, 12. In addition, Moore contends that he is owed a commission on a sale made on April 1, 2001 under work order no. 229687 and an unspecified amount for his last week as a production employee before he became a sales representative. These amount have not been included because they have not been documented by Moore.

**30.** Doc. 34, Affidavit of David Smith, ¶ 15.

**31.** *See, Warren Publ'g., Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1516 (11th Cir.1997).

## III. *DISCUSSION*

### A. *SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS*

#### 1. *Material Breach Defense*

■■ At the outset before determining whether the 1991 Agreement or the 1997 or 1998 Agreements are enforceable, and have been violated by Moore, the Court must address whether NAPCO has itself breached the employment agreements by failing to pay Moore the amounts he is lawfully owed. Under Florida law where the employer has materially breached an employment agreement by failing to pay the discharged employee compensation owed under the employment contract, the employee is relieved of any further obligation under the contract and the employer cannot obtain an injunction.[32] Thus, if Moore can establish that NAPCO has materially breached the employment agreements by failing to pay commissions owed to Moore, as Moore contends, NAPCO will not be entitled to enforce the non-competition covenant and non solicitation prohibition in either of the employment agreements.

The starting point for the analysis is the language in the employment agreement. The 1998 Agreement is the agreement that defined the parties' respective rights upon termination. Paragraph 2 of the 1998 Agreement provides that upon termination voluntarily by Moore he is entitled to be paid: (1) reimbursement for all expenses, (2) regular pay of base salary through the date of termination, (3) any quarterly bonus pay due through the end of the last quarter, and (4) any prorata annual bonus through the last quarter.[33] From this amount NAPCO is entitled to deduct any expense, advance or other amount due to NAPCO.

Moore contends that he is owed commissions for sales in March 2001 and for sales completed on April 1, 2001. As support, Moore avers that as part of NAPCO's standard practice, tooling representatives, like himself, were paid commissions a month in arrears. These monies were paid by dividing the amounts owed from the prior month into two payments, which were paid to the tooling representative on the fifteenth of the following month and on the thirtieth day of the following month. Thus, under this arrangement Moore normally would have been paid March commissions in two equal payments on April 15 and April 30. The commissions allegedly owed for sales on April 1 would be paid on May 15th and May 30th. Exhibit B attached to Moores' affidavit[34] evidences that in March, 2001 Moore generated sales of $45,584.00, which would entitle him to commissions of $1,857.00.

If the only issue was whether Moore is entitled to commissions in the amount of $1,857.00 there is no serious dispute that Moore should be paid these commissions in April and May 2001. The issue, however, is not whether Moore is entitled to be paid commissions but rather whether NAPCO is contractually obligated to pay Moore commissions earned but not yet payable at the time of his termination. The Court concludes that as a matter of law NAPCO is not obligated to pay commissions to Moore after termination where the commissions are not due and payable prior to termination. This conclusion is fully supported by the express language of the 1998 Agreement. The 1998 Agreement makes no mention, whatsoever, that commissions are to be paid by NAPCO upon termi-

---

32. *Bradley v. Health Coalition*, 687 So.2d 329, 333 (Fla.Dist.Ct.App.1997)(refusal to pay earned commissions); *Troup v. Heacock*, 367 So.2d 691, 692 (Fla.Dist.Ct.App.1979).

33. Doc. 36, ¶¶ 2.A.B.C.D. and E. These paragraphs are identical in the 1998 Agreement.

34. Doc. 37.

nation. Upon termination by the employee NAPCO is only obligated to pay base salary and any quarterly bonuses or prorata annual bonuses. Moore does not dispute that he received payment in full of his base salary and there is no issue raised that Moore was entitled to receive a quarterly or annual bonus. Thus, even assuming Moore is correct that he earned commissions in March and on April 1 of $1,857—and that the custom and practice of NAPCO was to pay these commissions the next month—the express language of the contract does not entitle Moore to be paid these sums after termination and NAPCO was not obligated to pay Moore these amounts upon termination.[35] When Moore became a tooling representative the parties expressly delineated in Moore's employment contract the monies he was entitled to be paid if he quit. There is no reason for the Court to proceed any further in determining the rights and obligations of the parties where, as here, the parties have expressly and unambiguously addressed the issue in their written contract. Accordingly, NAPCO has established a substantial likelihood of success on the merits with regard to Moore's defense that NAPCO materially breached the 1997 or 1998 Agreements by not paying him commissions from March and April 2001.

Because Moore also claims that he is owed out of pocket expenses the Court must also address whether NAPCO has a substantial likelihood of success on this issue. The Court can dispose of this claim by simple reference to the sworn statements of the parties. The gravamen of Moore's claim regarding un-reimbursed expenses is that he is owed $50.00 for expenses prior to January 2001 and is owed $70.00 for estimated expenses in March 2001. Glaringly absent, however, from Moore's claim is any documentary evidence, such as receipts, or any specificity of the amount or nature of the alleged expenses which are owed. Regarding the $50.00 Moore contends he is owed, the only record evidence offered by Moore is his conclusory statement that he *estimated* he is owed $50.00 more than the $500.00 he was reimbursed in January, 2001, when he was paid by NAPCO for past due expenses. Moore provides absolutely no details of the basis of his conclusion, does not aver when the expenses were incurred and does not specifically or even generically attempt to identify the expenses he contends were not paid.

With regard to the $70.00 allegedly owed for March, 2001 Moore again simply avers that he estimates he is owed $70.00 above and beyond the $280.00 advance he took on his credit card and fails to provide any detail or specificity as to his calculation.

In contrast, NAPCO avers that Moore has been reimbursed in full for all expenses for which a request has been received. Copies of each of the receipts, detailing the amount and nature of Moore's expenses are attached to the affidavit of David Smith.[36] While the Court normally cannot resolve material factual disputes in determining whether the moving party has established a likelihood of success on the merits, the Court concludes,

---

**35.** As an additional ground, NAPCO contends that when Moore was first paid commissions in October 19997 for sales he had made in September 1997, Moore had received a full fixed monthly salary for September 1997 and that if Moore was paid commissions upon termination he would be receiving double pay for one month (either the last month of full salary pay or the last month on which pay was based on a percentage of sales). *See,* Doc. 34, Affidavit of David Smith, ¶ 15. While this argument has not been refuted by Moore the Court does not need to resolve this issue because Moore is only entitled to be paid upon termination the amounts contractually agreed to in the 1998 Agreement.

**36.** Doc. 34, Ex. D.

here, that Moore's unsupported and wholly conclusory statement that he is owed $120.00 in expenses is insufficient to raise a material factual issue on the defense of material breach. Even assuming Moore is owed $120.00 for un-reimbursed expenses, this failure, standing alone, is at best *de minimis* and, thus, even if true does not constitute a "material" breach of the employment agreement sufficient to discharge Moore's obligations under the employment agreements. Accordingly, the Court concludes that NAPCO has established that it has a substantial likelihood of success on the merits regarding the affirmative defense of material breach.

■ Having determined that NAPCO has a substantial likelihood of success on the merits of Moore's material breach claim, the Court must then turn to the issue of whether NAPCO has a substantial likelihood of success on its claims that Moore breached the 1991 Agreement and the 1998 Agreement. In order to resolve this issue the Court must determine at the outset which of the employment agreements control.

On this issue NAPCO argues that it may enforce both the 1991 Agreement and the 1998 Agreement. Resolution of this issue is critical in view of the fact that the 1991 Agreement prohibits Moore from engaging in any competition with NAPCO in a broad geographic area for a period of 270 days. Assuming the 1991 Agreement controls, Moore's present affiliation with Tru–Cut—

a competing business—would violate the covenant not to compete and preclude Moore from continuing his involvement with Tru–Cut. On the other hand, if the 1998 Agreement is enforceable and controls, Moore would only be prohibited from soliciting customers of NAPCO with whom he had previous contact in the one year period prior to the termination of his employment with NAPCO.

### 2. *Which Agreement Controls?*

According to Moore only the 1998 Agreement [37] controls because there was a novation of the 1991 Agreement. NAPCO counters that the 1991 Agreement and the 1998 Agreement are cumulative in order to protect both the conduct and information Moore related to his production and service position, as well as that related to his sales position. Therefore, according to NAPCO both agreements apply to Moore's post-employment conduct.

■ In order to establish a novation a party to a contract must show (1) the existence of a previously valid contract, (2) an agreement to make a new contract, (3) intent to extinguish the original contract and obligation, and (4) the validity of the new contract.[38] Based on these elements, the intention of the parties controls whether novation occurs.[39] Intent need not be shown by express words in the contract but may be inferred from the facts and circumstances attending the transaction and the conduct of the parties thereafter.[40]

---

**37.** Although Moore's argument is directed to the 1998 Agreement due to the fact that NAP-CO had not yet identified the 1997 Agreement at the time of hearing, the Court does not need to resolve whether the 1997 or 1998 Agreement controls since their provisions are identical other than the territory. Because NAPCO has referred to the 1998 Agreement and this agreement was executed after the 1997 Agreement the Court will refer to the 1998 Agreement in this Report and Recommendation.

**38.** *Elmore v. Florida Power & Light,* 760 So.2d 968, 971–72 (Fla.Dist.Ct.App.2000).

**39.** *Electro–Protective Corp. v. Creative Jewelry by Kempf,* 513 So.2d 190, 192 (Fla.Dist.Ct. App.1987)

**40.** *Orlando Groves Co. v. Hale,* 119 Fla. 159, 161 So. 284, 291 (Fla.1935); *Prucha v. Guarantee Reserve Life Ins. Co. of Hammond,* 358 So.2d 1155, 1157 (Fla.Dist.Ct.App.1978).

Moore suggests there is evidence of novation in two ways. First, Moore avers that when he executed the 1998 Agreement he was told by Lu Myers, a District Sales Manager for NAPCO and Moore's former supervisor, that the new employment agreement superseded the original employment agreement because Moore was now in a different division of NAPCO.[41] The 1998 Agreement was signed by Lu Myers on behalf of NAPCO. The 1997 Agreement signed when Moore became a tooling representative was not executed by Lu Myers but rather another representative of NAPCO. According to Moore, this evidence establishes the necessary intent and elements to support novation.

Second, Moore contends that even in the absence of Lu Myers' statement, the 1998 Agreement supersedes the 1991 Agreement. According to Moore, a novation still occurred because the 1998 Agreement is of equal dignity to the original agreement and was made with respect to the same subject matter. Thus, the Court may, according to Moore, imply novation as a matter of law.

NAPCO contends that the statement by Lu Myers in 1998 is irrelevant in view of the fact that Moore signed an identical agreement in 1997 and thus there is no direct evidence that the parties intended to supersede the 1991 Agreement at the time that Moore executed the 1997 Agreement. Additionally, NAPCO contends that Lu Myers did not have any authority to extinguish the 1991 Agreement and, thus even if he told Moore the new agreement superseded the original agreement, the statement is not binding on NAPCO.

Consideration of the record on this issue leads the Court to conclude that it is not clearly established by NAPCO that the intent of the parties was to have both agreements operative at the same time.

Although novation is raised as an affirmative defense by Moore, at this stage of the proceedings the burden is on NAPCO, as the party requesting the entry of a preliminary injunction, to establish a substantial likelihood of success on the merits. Whether Moore will be successful on his novation defense remains to be seen. However, at this juncture, the record does not establish, and the Court cannot conclude, that NAPCO has a substantial likelihood of success on prevailing on Moore's novation defense. Whether the 1991 Agreement was or was not superseded by the 1997 and 1998 Agreements is an issue that cannot be resolved on the evidentiary record before the Court. Determination of this issue is dependent upon the intent of the parties which must be determined upon a full examination of the circumstances surrounding the transaction and not upon an abbreviated record consisting of affidavit testimony and excerpts from depositions.

For this reason the Court finds—for purposes of determining whether NAPCO should be granted the extraordinary relief of a preliminary injunction—that NAPCO has not established it has a substantial likelihood of success on its request to enforce the 1991 Agreement. Accordingly, the Court concludes that the only agreement that is controlling for purposes of Plaintiff's motion for preliminary injunction is the 1998 Agreement.

**3. *Enforcement Of The 1998 Agreement***

■ Turning now to the 1998 Agreement the Court must determine whether the factual record before the Court establishes that NAPCO has a substantial likelihood of success of enforcing this agreement.

---

**41.** Doc. 26, affidavit of Moore ¶ 4 and affidavit of Myers ¶ 4.

The enforceability of a covenant not to compete under the Florida Statutes is governed by the law in effect at the time the agreement was entered into.[42] Here, because the agreement was executed in 1998 the amended version of Florida's non-compete statute—effective on or after July 1, 1996—controls.[43] This statute requires the employer to plead and prove (1) the "existence of one or more legitimate business interests justifying the restrictive covenant" and (2) "that the contractually specified restraint is reasonably necessary to protect" the established interests of the employer.[44] Once the employer establishes a *prima facie* case the burden shifts to the employee to show that the restriction is "overbroad, overlong, or otherwise not reasonably necessary to protect" the established interests of the employer. Further, once the employer establishes one or more "legitimate business interests" justifying the restriction, irreparable injury must be presumed and the burden shifts to the employee to establish the absence of such injury.[45]

With regard to the issue of whether NAPCO has established that the 1998 Agreement protects "legitimate business interests" the statute provides that the term "legitimate business interest" includes: trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, customer goodwill associated with a specific geographic location or trade area and extraordinary or specialized training.[46]

There is little question under Florida law that an employer has a legitimate business interest in prohibiting solicitation of its customers with whom the employee has a substantial relationship.[47] Where an employee, as here, gains substantial knowledge of his former employer's customers, their purchasing history, and their needs and specifications it follows that the employer has a legitimate business interest under the statute.[48]

At least with regard to customers with whom Moore had contact as a tooling representative in his sales territory, Moore gained substantial knowledge about the needs of these customers including the names of customer contacts, the details of their service needs, and the manner in which they wanted their tools repaired, packaged, delivered and invoiced.[49] Accordingly, the Court concludes that NAPCO has established a legitimate business interest, which would entitle NAPCO to seek to enforce its non solicitation agreement with Moore as set forth in the 1998 Agreement.

Enforcement of the 1998 Agreement only prohibits Moore "[f]rom 'soliciting' business in competition with the Company [NAPCO] from any customers of ... [NAPCO], with which the employee [Moore] made sales efforts in the year prior to termination within ... Florida

**42.** *Gupton v. Village Key & Saw Shop, Inc.,* 656 So.2d 475, 477–79 (Fla.1995).

**43.** Fla. Stat. § 542.335.

**44.** *Id.* 542.335(1)(b) and (c). Section 542.335(1)(b) expressly proscribes that "[a]ny restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable."

**45.** *Id.,* 542.335(1)(j). This section re-establishes the pre–1990 amendment rule of *Capra-ro v. Lanier Business Products, Inc.,* 466 So.2d 212 (Fla.1985).

**46.** *Id.,* 542.335(1)(b)1.,2., 3., 4. and 5.

**47.** *Hapney v. Central Garage,* 579 So.2d 127, 134 (Fla.Dist.Ct.App.1991); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty,* 808 F.Supp. 1555, 1558 (S.D.Fla.1992).

**48.** *Id.*

**49.** Doc. 22, Ex. 9, pgs. 226–229.

... for a period of one year (360 days) after the date of termination." Moore contends there is no evidence that he directly contacted any of his past customers and that in the absence of such proof, NAPCO is not entitled to injunctive relief. NAPCO counters that Moore is violating the 1998 Agreement by Tru–Cut's solicitation and service of NAPCO's Florida customers. According to NAPCO, even if Moore himself has not directly contacted a past customer, but instead the customer was solicited by Bennett—the other Tru–Cut employee—as a matter of law, Moore cannot avoid the reach of the non-solicitation agreement by using a straw man to make the phone calls. The Court agrees.

Turning first to the express language of the 1998 Agreement, Moore agreed that "[u]pon termination of employment for whatever reason, the Employee [Moore] will refrain from *soliciting* business in competition with the Company [NAPCO] from any customers of the Company [NAPCO] ..." [50] The term "solicitation" is defined by Black's Law Dictionary as "asking or enticing" and "any action which the relation of the parties justifies in construing into a serious request." Thus, utilizing the plain meaning of the words in the non-solicitation clause of the 1998 Agreement Moore was prohibited from enticing any customers of NAPCO with whom he had done business to engage in business with his new company Tru–Cut.[51] Although the record does not evidence that Moore directly telephoned or visited any customers,

there is sworn evidence that "since his departure from NAPCO, Mr. Moore has solicited and serviced, or is servicing, at least eighteen of twenty-eight customers, Mr. Moore dealt with directly, or exclusively, during his employment at NAPCO." [52] Further, the various affidavits of customers, filed by NAPCO in support of its request for preliminary injunctive relief, disclose that Bennett, on behalf of Tru–Cut, contacted them on the day after Moore quit working for NAPCO and successfully solicited their business.[53] At least two of NAPCO's customers aver that not only were they solicited by Bennett shortly after Moore quit his affiliation with NAPCO to do business with Tru–Cut but that they knew "Bennett was affiliated with Mr. Moore and that by doing business with Mr. Bennett ... [they] were also doing business with Mr. Moore." [54] Thus, the record evidences that customers of NAPCO were enticed to do business with Moore's new company, a direct violation of the non-solicitation agreement in the 1998 Agreement.

Although there is no Florida case that directly addresses the issue of whether use of a "straw man" violates a non-solicitation agreement, Florida courts have not hesitated to enforce non-compete agreements against both the employee who signed the agreement as well as against the corporation through which the ex-employee conducted business even where the employee was the only signatory to the non-compete agreement.[55] That rationale is equally ap-

---

50. Doc. 36.

51. There is no dispute that NAPCO and Tru–Cut engage in competition with each other in the tool repair and sales business in geographic areas in which both companies make sales and perform repairs.

52. Doc. 22, Ex. 8, ¶ 20.

53. Doc. 22, Exs. 4, 5, 6, and 7.

54. Doc. 22, Ex. 5, ¶ 6; Ex. 6, ¶ 6.

55. *See, Temporarily Yours–Temporary Help Services, Inc. v. Manpower, Inc.,* 377 So.2d 825, 827 (Fla.Dist.Ct.App.1979)("[t]he injunction was properly issued against the appellant corporation, as well as against ... [the ex-employee], since the corporation apparently existed for the purpose of aiding and abetting and assisting ... [the ex-employee] in violating his covenant not to compete.").

plicable here. There is no dispute that Bennett solicited business from Moore's customers at NAPCO on behalf of Moore's newly formed company, Tru–Cut. It is also not disputed that: (1) Moore and his wife were the initial shareholders of Tru–Cut, (2) Moore has served, since the formation of Tru–Cut, as president and/or general manager, and (3) Moore functions as the chief executive officer of the company—the person ultimately responsible for the business operation of Tru–Cut.[56] As such, Bennett's solicitation of NAPCO customers as agent of Tru–Cut is chargeable to both Moore and his company, Tru–Cut. Any other result would render a non-compete clause or a non-solicitation clause to be unenforceable by use of the simple expedient of performing all solicitations in the name of a corporate nonsignatory or through use of an agent to aid and assist the ex-employee in violating the agreement. Moore's strained interpretation of the non-solicitation clause, here, would foster just such a result.

Accordingly, the Court concludes that NAPCO has established that it has a substantial likelihood of success of proving that Moore violated the non-solicitation clause in the 1998 Agreement even if NAPCO cannot establish that Moore, himself, made the sales call.[57]

## B. *IRREPARABLE INJURY*

 Having concluded that NAPCO has established that it has a substantial likelihood of success on the merits, the Court must address whether NAPCO will be irreparably injured unless a preliminary injunction is issued.

The 1996 amendment to Florida's statute dealing with restrictive covenants expressly provides for a rebuttable presumption of irreparable injury flowing from the violation of an enforceable restrictive covenant.[58] Thus, once the party requesting enforcement of the restrictive covenant establishes one or more "legitimate business interests" justifying the restriction, irreparable injury must be presumed by the Court and the burden shifts to the defendant to establish the absence of such injury.

Here, as previously discussed, the Court has concluded that NAPCO has a legitimate business interest in protecting the substantial relationships it has with its existing customers and thus the Court must presume that NAPCO will be irreparably harmed unless Defendant can establish that NAPCO will not be harmed.

Defendant contends that NAPCO cannot establish irreparable injury because it does not have contracts with its customers. From this premise Defendant concludes that in the absence of a contractual relationship Moore could not have interfered with customer relationships and, thus, NAPCO has not suffered any harm. Additionally, Defendant contends that the mere loss of business revenue does not denote irreparable injury sufficient to sustain injunctive relief.

Defendant's argument—that the lack of a contractual relationship is fatal to proof of irreparable injury—is without merit. The focus of preliminary injunctive relief is on maintaining long standing relationships and preserving the goodwill of a company built up over the course of years of doing

---

**56.** Doc. 22, Ex. 3; Ex. 9, pgs. 14, 22, 50.

**57.** The record evidences that Tru–Cut is servicing or has serviced at least eighteen of twenty-eight of NAPCO's customers who previously dealt directly, if not exclusively, with Moore while he was at NAPCO. Doc. 22, Ex.

9, pgs. 105–106, 109, 118, 122–123, 127, 130, 132, 143, 143–148, 165–166, 168–170, 172, 189, 191, 196–200; Ex. 12, pgs. 47–104; Ex. 8, ¶ 19.

**58.** *Fla. Stat.* § 542.335(1)(j)(2001).

business. Whether a company has a contract or not with its customers has no bearing on whether the company has been or will be damaged by solicitation of its customers. Indeed, if a company was required to prove it had contracts with its customers as a prerequisite to preliminary injunctive relief all businesses that sell products and services to their customers on a consistent basis without a contract would be precluded from protecting these relationships through non-compete and non-solicitation agreements. This is not the law in Florida and is not a sufficient ground to rebut the presumption of irreparable harm.

Plaintiff's argument that there is no irreparable harm because Plaintiff's injuries, if any, are subject to a monetary judgment, is equally without merit and has been rejected by other courts, where, as here, there is a statutory presumption of irreparable harm.[59]

Defendant's arguments are insufficient to rebut the presumption of irreparable injury mandated by the current Florida Statute. Moreover, where a defendant ex-employee solicits the plaintiff company's customers, even courts addressing the issue prior to the adoption of the statutory presumption, enacted in 1996, have held that irreparable injury is presumed.[60] Accordingly, the Court concludes that NAPCO has established that if an injunction is not issued it will be irreparably injured.

### C. THREATENED INJURY TO PLAINTIFF OUTWEIGHS ANY HARM TO DEFENDANT

■ The Court must next examine the balance of harms between the parties.

There is little question that with regard to NAPCO the Defendant's solicitation of customers of NAPCO through his business, Tru–Cut, interferes with Napco's relationships with its established customers, who were serviced by Moore prior to his departure. Tru–Cut has been extremely successful within a limited amount of time in obtaining NAPCO customers and establishing relationships with these customers. The net effect of this solicitation has a high possibility of permanently damaging the reputation and goodwill of NAPCO.

■ On the other hand, the harm to Defendant is not significant. While Moore and his business are prohibited from soliciting NAPCO customers with whom Moore did business in the year prior to his departure, Moore is not prohibited under the 1998 Agreement from operating a competing business or from soliciting customers in the market so long as they are not NAPCO customers with whom Moore did business prior to his departure from NAPCO. Moreover, in balancing the interests of the parties, under the version of the statute passed in 1996, the Court is precluded from considering the individual economic hardship that the ex-employee would suffer if the covenant is enforced.[61]

Accordingly, for these reasons the Court concludes that the balance of harms weighs in favor of NAPCO.

### D. THE PUBLIC INTEREST

■ Under Florida law, the public has an interest in the enforcement of restrictive covenants. This view is codified in the 1996 amendment to the statute. The Florida statute sharply limits the use

---

**59.** *Merrill Lynch Pierce Fenner & Smith, Inc., v. Hagerty,* 808 F.Supp. 1555, 1558–59 (S.D.Fla.1992)

**60.** *Hagerty,* 808 F.Supp. 1555, 1558–59(injunctive relief granted to prevent solicitation of existing customers); *Sun Elastic Corporation v. O.B. Industries,* 603 So.2d 516 (Fla. Dist.Ct.App.1992)

**61.** Fla. Stat. § 542.335(1)(g)1.

of the "contrary to public policy" defense to enforcement of a restrictive covenant. A court may not refuse enforcement on grounds of public policy unless the court articulates the public policy with specificity and finds that the specified public policy requirements substantially outweigh the need to protect the interest established by the proponent of the restriction.[62]

The Court concludes that the injunction will further the public interest. The injunction only prohibits the Defendant from soliciting his prior customers at NAPCO and does not prevent the Defendant from establishing a competing business or from engaging in the tool repair and sales business. Accordingly, entry of a preliminary injunction will advance the public interest and do nothing adverse to the public interest.

### E. BOND

Pursuant to Rule 65(c) and Fla. Stat. § 542.335(1)(j) no preliminary injunction should issue without the giving of security by the applicant sufficient for payment of costs and damages as may be incurred or suffered by any party to have been wrongfully enjoined.

At the hearing, it was suggested that Tru–Cut was earning gross revenues in the range of $40,000 per month. While the parties did not specify what portion of this revenue was attributable to business from customers of NAPCO with whom Moore did business while employed at NAPCO, the affidavit of NAPCO's National Sales Manager, Milford Keene, discloses that Tru–Cut has serviced or is servicing at least eighteen of twenty-eight customers with whom Moore dealt directly or exclusively during his employment with NAP-CO.[63] From this the Court concludes that a significant portion of the sales of Tru–Cut may be attributable to these custom-

ers. It is thus reasonable to assume that yearly revenues in the range of $350,000 to $500,000 may be attributable to sales to those customers to whom the non-solicitation agreement may apply. Therefore, the Court concludes that an injunction bond in the total amount of $500,000 should be more than sufficient to compensate the Defendant for any loss in the event it should be determined the injunction was improvidently entered. Further, to the extent that the parties wish to contest the amount of the injunction bond recommended in this report and recommendation they may file a brief limited to five pages within 10 days of the date of this order setting forth in detail their position with regard to the amount of the injunction bond.

Accordingly, in order for the injunction to be effective the Plaintiff will be required to file an injunction bond in the amount of $500,000 with the Court in a form to be approved by the Clerk of the Court in order to compensate the Defendants should it later be determined that the preliminary injunction should not have been entered.

### IV. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that Plaintiff's Motion For Preliminary Injunction (Doc. 20) be **GRANTED in part** and be **DENIED in part** and that the Court enter a preliminary injunction enjoining Michael J.Moore and Tru–Cut from:

(1) directly or indirectly soliciting business, involving the maintenance, repair or sale of tools, including cutting tools, from any customers of North American Products Corporation with which Michael J. Moore made sales efforts while employed by North American Products

---

**62.** Fla. Stat. § 542.335(1)(i).

**63.** Doc. 22., Ex. 8, ¶ 20.

Corporation in the year prior to April 1, 2001 within the state of Florida and that the injunction be effective for a period of time of 360 days after April 1, 2001.

Feb. 6, 2002.