**AUTONATION, INC., Plaintiff,**

v.

**James G. O'BRIEN, Jr., Defendant.**

**No. 0460767CV.**

United States District Court,
S.D. Florida.

Dec. 2, 2004.

Jon Kevin Stage, Eric K. Gabrielle, Stearns Weaver Miller Weissler Alhadeff & Sitterson, Fort Lauderdale, FL, for Plaintiff.

Leonard Keith Samuels, Jeffrey Scott Wertman, Berger Singerman, Fort Lauderdale, FL, for Defendant.

### AMENDED ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon Plaintiff's Expedited Motion for Preliminary Injunction, filed herein on July 14, 2004 [DE–9], Defendant's Response to Plaintiff's Motion, filed herein on July 20, 2004 [DE–17], and Plaintiff's Reply Memorandum in Support, filed herein on July 22, 2004 [DE–23]. After carefully considering the Motion, having heard the argument of counsel, and being otherwise fully advised in the premises, the Court finds as follows:

## I. BACKGROUND

Plaintiff AutoNation, Inc. ("AutoNation") is a Delaware corporation qualified to do business in the State of Florida, with its principal place of business in Fort Lauderdale, Florida. AutoNation owns more than 250 vehicle dealerships in 18 states and sells new and used vehicles built by 35 separate manufacturers. AutoNation is one of the leading automotive retailers in the used car industry.

Defendant James G. O'Brien, Jr. ("O'Brien") is a citizen of North Carolina and is currently employed by Sonic Automotive ("Sonic"), a direct competitor of AutoNation.[1] On February 5, 2003, AutoNation hired O'Brien to work as a Manager of Used Vehicle Operations in its corporate headquarters in Fort Lauderdale, Florida. O'Brien's salary was $100,000 per annum with a $50,000 signing bonus. The first half of O'Brien's signing bonus was payable immediately and the second half was payable in twelve (12) months. Additionally, AutoNation provided the substantial relocation costs associated with O'Brien's move from California to Florida.

As a Manager of Used Vehicle Operations, AutoNation claims O'Brien's primary responsibilities included managing proposed policies, procedures, practices, and reports between and among AutoNation's national districts and numerous dealerships. AutoNation claims that O'Brien had access to AutoNation's financial and business-related analyses, research, forecasts, trends in sales, finance, overall business conditions, computer applications, procedures, and other systems designed for AutoNation's used vehicle operations. Additionally, AutoNation claims that O'Brien had access to AutoNation's 3–year Strategic Plan regarding its used vehicle operations. Accordingly, AutoNation states that a competitor, like Sonic, could use this information and gain an unfair competitive advantage in any market in which they both operate.

On February 5, 2003, and again on August 12, 2003, O'Brien signed non-compete agreements with AutoNation.[2] The perti-

---

1. O'Brien has been employed with various companies in the automotive industry for the past fifteen (15) years. O'Brien has a master's degree in business administration from Wake Forest University.

2. As part of an AutoNation incentive program, AutoNation offered certain personnel the opportunity to participate in a voluntary stock option plan. In return for their participation in the plan, AutoNation personnel were required to sign AutoNation's Confidentiality and Non–Compete Agreement. O'Brien signed a July 28, 2003 Restrictive Covenants and Confidentiality Agreement (the

nent language of O'Brien's current Non–Compete Agreement with AutoNation states in relevant part:

> Except where [ ] prohibited by applicable law, Associate [ ] agrees that he [ ] shall not during the period [ ] ending one year after the date that Associate's employment or engagement with the Company is terminated (for any reason), directly or indirectly, [ ] engage in selling, leasing or servicing of any new or used vehicles [ ] anywhere in the United States.

(Plaintiff's Exhibit 1, ¶ 2(c))

However, O'Brien claims that shortly after his arrival, AutoNation's used car division was significantly restructured. O'Brien states that Adam Simms, the employee who recruited O'Brien to work at AutoNation, was terminated in May of 2003.[3] O'Brien claims that despite promises to the contrary, he was never provided the opportunity to perform the functions of a manager working in the used car division of a large automotive retailer. O'Brien states that he only performed menial tasks (creating PowerPoint presentations) that would normally be assigned to a low level analyst.

O'Brien claims that due to growing frustrations with his responsibilities at AutoNation, he asked for a meeting with his immediate supervisor, Donna Parlapiano, the Vice President of Used Vehicles and O'Brien's new supervisor after Simms' ter-

mination. Although there is some disagreement on this issue, O'Brien was allegedly given the following opportunities: (1) remain in his current position; (2) resign his employment with AutoNation and accept a severance package; or (3) sell vehicles in one of AutoNation's dealerships. Accordingly, for a few months, O'Brien sold cars at a Mercedes dealership in Fort Lauderdale, Florida.[4] However, O'Brien left AutoNation and began working in May of 2004 as a Used Car Manager for Sonic Automotive in North Carolina.

On June 14, 2004, AutoNation filed a Complaint for injunctive relief and damages alleging that O'Brien breached his Non–Compete Agreement with AutoNation by accepting employment with Sonic Automotive. On July 14, 2004, AutoNation filed the instant Motion for Preliminary Injunction asking the Court to enjoin O'Brien from working in direct competition with AutoNation.

## II. DISCUSSION

In order to obtain a preliminary injunction, a plaintiff must establish the following four elements: (1) a substantial likelihood that the plaintiff will prevail on the merits; (2) a threat that the plaintiff will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the threatened harm the injunction may do to the

---

"Non–Compete Agreement") on August 12, 2003.

3. While at AutoNation, Mr. Simms was employed as the Vice President of Used Vehicle Operations. Apparently, AutoNation waived, or is not enforcing, Mr. Simms' Non–Compete Agreement. Mr. Simms is currently working as the General Manager of a Toyota dealership in Sunnyvale, California.

4. Again, there is some disagreement on this issue, but O'Brien claims that he only accept-

ed such employment to obtain the second half of his signing bonus and to provide income and health insurance for his family. However, Ms. Parlapiano testified that the decision was motivated in part by O'Brien's desire to round out his "skill set" in the automotive industry. Moreover, there is also disagreement as to whether Ms. Parlapiano told O'Brien that his Non–Compete Agreement would be waived in the event that he went to work at one of AutoNation's dealerships.

defendant; and (4) granting the preliminary injunction will not disserve the public interest. *Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1561–62 (11th Cir. 1989). The plaintiff has the burden of persuasion as to each of these four elements. *U.S. v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983). Although entering an injunction is within the discretion of the district court, it is an "extraordinary remedy" which should only be granted if the movant carries the burden of persuasion on its claims. *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir.2003).

### A. The Likelihood of Success on the Merits

■ Under Section 542.335 of the Florida Statutes, restrictive covenants are valid if the employer can prove: (1) the existence of one or more legitimate business interests justifying the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer. *North American Products Corp. v. Moore*, 196 F.Supp.2d 1217, 1228 (M.D.Fla.2002). If the employer can establish its *prima facie* case, the burden shifts to the employee to show that the restriction is overbroad, overlong, or otherwise not reasonably necessary to protect the established interests of the employer. Fla. Stat. 542.335(1)(c). Additionally, when the employer establishes a legitimate business interest, irreparable injury must be presumed and the burden shifts to the employee to establish the absence of such injury. Fla. Stat. 542.335(1)(j); *North American Products Corp.*, 196 F.Supp.2d at 1228; *Don King Prods., Inc. v. Chavez*, 717 So.2d 1094, 1095 (Fla. 4th DCA 1998).

Pursuant to Florida's statute, "legitimate business interests" include: trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, customer goodwill, and extraordinary or specialized training. Fla. Stat. 542.335(1)(b). Moreover, courts are statutorily required to construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement. Fla. Stat. 542.335(1)(h); *Auto-Nation, Inc. v. Maki*, 2004 WL 1925479, *3 (Fla.Cir.Ct. Aug. 25, 2004).

■ In Florida, confidential business information is considered a legitimate business interest that can be protected by a restrictive covenant in an employment contract. *New Horizons Computer Learning Centers, Inc. v. Silicon Valley*, 2003 WL 23654790, *6 (M.D.Fla. Nov. 12, 2003). However, information that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection. *Anich Indus., Inc. v. Raney*, 751 So.2d 767, 771 (Fla. 5th DCA 2000) (citing *Keel v. Quality Med. Syst., Inc.*, 515 So.2d 337–38 (Fla. 3d DCA 1987)).

In the instant case, AutoNation asserts that high-level personnel, like O'Brien, are provided with valuable confidential business information and specialized training as an ongoing investment designed to give AutoNation an advantage over its competitors. In that regard, AutoNation claims that it spends millions of dollars and substantial professional time in gathering, organizing, and analyzing such information. O'Brien claims that although AutoNation may in fact have confidential information "somewhere," the information that AutoNation seeks to protect in this case is commonly known in the industry. Moreover, O'Brien's expert witness, Joseph Lescota, testified that AutoNation's "confidential information" is commonly known in

the industry and there is nothing proprietary or confidential about the information.[5]

After carefully considering the arguments and the evidence submitted in this case, the Court finds that AutoNation has established legitimate business interests justifying the enforcement of O'Brien's Non–Compete Agreement. The testimony and evidence submitted by the parties demonstrated that as a high-level professional at AutoNation, O'Brien was exposed to confidential and proprietary information associated with running the used car division of a large automotive retailer.

Specifically, AutoNation demonstrated that O'Brien had access to confidential and proprietary business information including: (1) AutoNation's Best Practices; (2) AutoNation's Peer Performance Reports; (3) information disclosed at AutoNation's Monthly Operating Review Meetings; and (4) information on AutoNation's Dealer Central Website. *See AutoNation v. Maki,* 2004 WL 1925479, *3 (Fla.Cir.Ct. Aug. 25, 2004) (finding that an AutoNation employee received or had access to confidential and proprietary business information including Best Practices, Peer Performance Reports, information at Monthly Operating Review Meetings, information on the Dealer Central Website, and information in the Compensation Tools Program); *AutoNation, Inc. v. Hankins,* 2003 WL 22852206, *9 (Fla.Cir.Ct. Nov. 24, 2003) (finding that an AutoNation employee had access to and received confidential and proprietary information including Best Practices, Peer Performance Reports, information at Monthly Operating Review Meetings, information on the Dealer Central Website, and information in the Compensation Tools Program).

With respect to AutoNation's "Best Practices," the Court notes that such information is derived from each AutoNation dealership and represents a compilation of AutoNation's best business strategies and techniques. Such information is based upon a nationwide comparison of AutoNation's dealerships, including a multi-year history and various projections of operational information. The information is not publicly available. Additionally, the Court notes that the Peer Performance Reports contain a detailed breakdown and analysis of numerous aspects of AutoNation's dealership operations. The Peer Performance Reports include information regarding top AutoNation dealerships, their used car sales, gross revenues, operating expenses, used vehicle inventories, finance information, and personnel summaries. The information is not publicly available.

With respect to AutoNation's Monthly Operating Review Meetings, each dealership provides confidential business information which includes the gross volume of used vehicle sales and detailed market analyses. The information is not publicly available. Additionally, AutoNation has developed an interactive website called the Dealer Central Website which includes a program called the ABMT Tool Program. The ABMT Tool Program includes nonfidential business information regarding the upcoming year's advertising strategies and marketing plans.[6] The information includes where dealerships will focus their advertisements, what media will be used, their budget for marketing, and the type

---

**5.** Mr. Lescota is a full-time professor affiliated with Northwood University of Midland, Michigan, where he serves as the Chairman of the Automotive Marketing Department. Mr. Lescota is also the President and Founder of Management Education & Training, a management training and consulting firm specializing in used vehicle management training.

**6.** There is some disagreement whether O'Brien ever accessed the ABMT Tool Program.

of customer that will be targeted. The information is not publicly available.

Accordingly, as a Manager of Used Vehicle Operations employed within AutoNation's corporate headquarters, O'Brien had access to confidential and proprietary business information. O'Brien's responsibilities included managing policies, procedures, systems, vehicle programs, practices, and reports between and among AutoNation's national districts and numerous dealerships. O'Brien had access to financial and business-related analyses, research, forecasts, trends in sales, finance, and overall business conditions.[7] Additionally, O'Brien was responsible for working on a Used Vehicle Manager Training Course which O'Brien recommended that AutoNation "make absolutely clear that the system is proprietary to AutoNation and not be shared outside the company." (Plaintiff's Exhibit 10.)

O'Brien also participated in negotiating AutoNation's contract with Auto Exchange, a widely used program in the automotive industry. In a draft memorandum to Mike Maroone, AutoNation's President and Chief Operating Officer; O'Brien highlighted various points of the Auto Exchange contract including the fact that "future improvements/changes will be proprietary to [AutoNation]." (Plaintiff's Exhibit 8.) Further, attached to the contract with Auto Exchange was a list of materials that AutoNation deemed confidential and proprietary. (Plaintiff's Exhibit 20.) Additionally, O'Brien was asked to participate in the Used Car Manager Assessments which cataloged AutoNation's used car managers' performance at various Au-

toNation dealerships. Finally, O'Brien had access to AutoNation's 3–year Strategic Plan. (Plaintiff's Exhibit 26.)

Moreover, the evidence presented at the hearing demonstrated that O'Brien is in a position to use AutoNation's confidential and proprietary business information in a way that would irreparably harm AutoNation's business interests. The Court notes that the used car business is a "highly competitive" industry and that O'Brien would be able to implement, or mirror, what he learned about AutoNation's policies, practices, and business methods, in his new position with one of AutoNation's direct competitors.[8]

■ AutoNation claims that O'Brien was also provided with specialized training as an ongoing investment designed to give AutoNation an advantage over its competitors. At the preliminary injunction hearing, AutoNation provided evidence that O'Brien's training was primarily based upon working as the "right-hand person" of Donna Parlapiano, the Vice President of Used Vehicles. O'Brien testified that he was not required to attend the various training seminars and only "popped in and out" of the meetings. Accordingly, AutoNation has not demonstrated any specialized training exceeding what would be common or typical in the industry. Therefore, the Court finds that AutoNation has not adequately demonstrated a legitimate business interest in any training provided to O'Brien.

However, the Court finds that AutoNation has established other legitimate business interests which justify enforcement of

---

7. AutoNation does not allege that O'Brien physically removed any confidential information from AutoNation's headquarters.

8. Apparently, Sonic owns approximately 75 dealerships located within 10 miles of various AutoNation dealerships. Although O'Brien indicated that he did not bring any confidential AutoNation information to Sonic, O'Brien testified that he had seen a copy of AutoNation's Used Vehicle Manager Checklist in one of Sonic's corporate offices.

O'Brien's Non–Compete Agreement. Although both O'Brien and his expert, Joseph Lescota, testified that AutoNation's information is well known in the industry, the Court finds that O'Brien was exposed to confidential and proprietary information while employed at AutoNation. Granted, there may be certain aspects of AutoNation's business practices which are known in the industry on a general level. For example, the fact that automotive retailers reduce the price of used vehicles the longer they remain on the lot. However, it is evident that AutoNation undertakes great expense to collect and analyze information gleaned from 250 dealerships across the country in order to implement its most profitable and efficient practices. It is also evident that AutoNation attempts to keep this information confidential and would not be inclined to share such information with a direct competitor.

Accordingly, AutoNation has demonstrated that a competitor who obtains the benefit of its confidential information would gain an unfair competitive advantage over AutoNation in the markets in which they both operate. As discussed in the next section of this Order, O'Brien has not demonstrated how his Non–Compete Agreement is overbroad, overlong, or otherwise not reasonably necessary to protect AutoNation's established interests. Therefore, based upon all of these factors, the Court finds that AutoNation has demonstrated a substantial likelihood of success on the merits of the underlying action.

B. *The Threat of Irreparable Injury If the Injunction Is Not Granted*

Once the party seeking enforcement of a restrictive covenant establishes one or more legitimate business interests justifying the restriction, irreparable injury is

"presumed" by the Court and the burden then shifts to the employee to establish the absence of such injury. Fla. Stat. § 542.335(1)(j); *North American Products Corp.,* 196 F.Supp.2d at 1230; *America II Electronics, Inc. v. Smith,* 830 So.2d 906, 908 (Fla. 2d DCA 2002) (finding that under Section 542.335(j) of the Florida Statutes, a party seeking enforcement of a restrictive covenant by injunction need not directly prove that defendant's activities will cause irreparable harm if not enjoined). The burden shifts to the party opposing enforcement to demonstrate that the restriction is overbroad, overlong, or otherwise not reasonably necessary to protect the interests of the party seeking enforcement. Fla. Stat. § 542.335(1)(c); *North American Products Corp.,* 196 F.Supp.2d at 1228.

■ However, O'Brien has not demonstrated how the Non–Compete Agreement is overbroad, overlong, or otherwise not reasonably necessary to protect AutoNation's legitimate business interests. Initially, the Court notes that the restriction at issue is limited to a one (1) year period. *See New Horizons Computer Learning Centers, Inc. v. Silicon Valley Training Partners, Inc.,* 2003 WL 23654790, *6 (M.D.Fla. Nov. 12, 2003) (stating that under Section 542.335(1)(d) of the Florida Statutes, any restraint less than six (6) months is presumed to be reasonable and any time restraint exceeding two (2) years is presumed to be unreasonable). Next, the Court notes that AutoNation asks that the geographic scope of the injunction be less than provided in the actual Agreement. AutoNation requests that O'Brien be prohibited from working in any geographic space in which AutoNation operates.[9] AutoNation indicated that Sonic

---

9. Such request is less than outlined in the Non–Compete Agreement. The Agreement

prohibits O'Brien from engaging in the selling, leasing, or servicing of any new or used

owns approximately 75 dealerships located within 10 miles of various AutoNation dealerships in different parts of the country. (Plaintiff's Motion at 7.) Accordingly, the Court finds that the requested injunction is reasonable in both time and scope, and further, that based upon the statutory presumption and evidence submitted at the hearing, AutoNation will suffer immediate and irreparable harm if the injunction is not granted.

### C. Whether the Injury Outweighs the Harm

A careful consideration of the relative harms between AutoNation and O'Brien weighs in favor of issuing an injunction. O'Brien was privy to AutoNation's confidential and proprietary business information which could be used to Auto-Nation's detriment and has now accepted a position with the corporate offices of Sonic Automotive, a direct competitor of Auto-Nation. The evidence submitted in this case demonstrated that AutoNation's confidential business information was developed and collected over an extended period of time and at considerable expense to AutoNation. Moreover, the use of such information by a direct competitor would provide an unfair advantage in the competitor's efforts to compete with AutoNation.

The Court has also considered the harm to O'Brien in not being able to work in any geographic area in which AutoNation operates. However, considering that O'Brien agreed to the Non–Compete Agreement and that such agreement was a condition of O'Brien's compensation and employment with AutoNation, the Court considers that the relative harm between the parties weighs in favor of issuing an injunction. Finally, the Florida Legislature has ex-

pressly recognized that violations of restrictive covenants cannot adequately be remedied by money damages alone and may therefore be enforced through injunctive relief. Fla. Stat. § 542.335.

### D. Whether an Injunction will Further the Public Interest

As evidenced by the Legislature's enactment of Section 542.335 of the Florida Statutes, public policy in Florida favors enforcement of reasonable covenants not to compete. In the instant case, the Court finds that enforcement of O'Brien's Non–Compete Agreement will further the public interest by assisting AutoNation in protecting its investment in confidential and proprietary business information that it uses to become a more profitable and efficient business enterprise. Additionally, the Florida Legislature has determined that in order to refuse enforcement of an otherwise enforceable restrictive covenant based on public policy considerations, the specified public policy must substantially outweigh the need to protect the legitimate business interest or interests established by the person seeking enforcement of the restraint. Fla. Stat. § 542.335(1)(I).

### E. O'Brien's Claim that the Non–Compete is the Subject of a Novation

O'Brien claims that when he was "forced" to work as a commissioned salesman, he was required to sign a new employment agreement. O'Brien claims that the new agreement did not reiterate any of the restrictive covenants contained in his prior employment agreement. Accordingly, O'Brien claims that a novation occurred and his Non–Compete Agreement is no

---

vehicles "anywhere" in the United States for a one year period. However, AutoNation now requests that O'Brien only be prohibited

from working in any area that AutoNation operates.

longer applicable. AutoNation responds to this argument by citing the language of O'Brien's Non–Compete Agreement which provides that the provisions of that Agreement shall not be waived unless in writing and executed by the party waiving the right. (Plaintiff's Exhibit 1, ¶ 10.)

Accordingly, a review of the agreement which O'Brien claims is a "new employment agreement" indicates that it confirms O'Brien's transfer from Director of Used Vehicle Operations to Internet Sales Guide. Such letter indicates the date of his transfer, a transition bonus, his regular bonus eligibility, a confirmation of O'Brien's original sign-on bonus, and a re-iteration of O'Brien's employment at will status. However, there is no indication that the terms of O'Brien's Non–Compete Agreement were waived or abridged in any manner. *See North American Products, Corp.,* 196 F.Supp.2d at 1226 (stating that it is the intention of the parties that controls and intentions may be inferred from facts and circumstances attending the transactions and the conduct of the parties thereafter). Therefore, based upon the evidence presented by the parties, the Court does not find that there was a novation of O'Brien's promise not to compete with AutoNation.

### F. *Other Defenses*

O'Brien argues that even if this Court finds a legitimate business interest worthy of protection under the statute, the Court should consider equitable defenses under Section 542.335(g)(3). In response to AutoNation's Motion, O'Brien identified a list of nine (9) "additional reasons" why AutoNation cannot establish a substantial likelihood of success on the merits including: (1) failure to state a claim upon which relief can be granted; (2) the relief requested is barred by the doctrine of unclean hands; (3) the relief requested is barred by the doctrine of laches; (4) the relief requested is barred by the doctrine

of waiver; (5) the relief requested is barred by the doctrine of estoppel; (6) AutoNation materially breached its obligations to O'Brien thereby relieving O'Brien's obligation to comply with the Non–Compete Agreement; (7) the Non–Compete Agreement is overbroad in geographic scope; (8) the Non–Compete Agreement is overbroad in the activities it seeks to prevent and is not narrowly tailored; and (9) O'Brien's employment with Sonic does not fall within the scope of the Non–Compete Agreement.

Accordingly, the Court has considered O'Brien's "additional reasons" why AutoNation cannot establish a substantial likelihood of success on the merits and is not persuaded that any of these defenses prevent the Court from issuing an injunction in this matter. To the extent that a defense is not fully addressed in this Order, O'Brien has not sufficiently briefed or argued the defense in a manner that the Court is capable of giving full consideration. Therefore, the Court will decline O'Brien's request that the Court deny AutoNation's Motion on these "additional reasons."

### III. CONCLUSION

Wherefore, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Expedited Motion for Preliminary Injunction, filed herein on July 14, 2004 [DE–9] is **GRANTED.**

2. O'Brien shall not during the period commencing on the date of this Order and ending on August 5, 2005, or until further Order of this Court, directly or indirectly, alone or in any other capacity, including without limitation as a partner, joint venturer, officer, director, member, employee, consultant, agent, independent contractor, stockholder, landlord or lessor of, or lender to, any company or business (or any af-

filiate thereof), engage in selling, leasing, or servicing of any new or used vehicles or in the wholesale or retail supply of parts with respect thereto, or engage in any additional related or other businesses that AutoNation engages in at any time, anywhere in the geographic space that AutoNation operates. Such geographic space shall be defined as a 10 mile radius from any AutoNation dealership. However, O'Brien shall not be deemed to have violated the prohibition hereunder merely due to the beneficial ownership of less than one percent (1%) of the shares of stock of any corporation having a class of equity securities actively traded on a national securities exchange or over-the-counter market.

3. AutoNation's Request for Judicial Notice [DE–86] is **GRANTED.** A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but to establish the fact of such litigation and related filings. *U.S. v. Jones,* 29 F.3d 1549, 1553 (11th Cir.1994) (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388–89 (2d Cir.1992)).

4. O'Brien's Motion to Strike [DE–103] is **DENIED.** A court will not exercise its discretion to strike a pleading unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party. *Reyher v. Trans World Airlines, Inc.,* 881 F.Supp. 574, 576 (M.D.Fla.1995).