**WINMARK CORP., Plaintiff**

v.

**BRENOBY SPORTS, INC., and others, Defendants.**

**Civil Action No. 13–62697–Civ.**

United States District Court,
S.D. Florida.

Signed July 10, 2014.

Ansis V. Viksnins, Lindquist & Vennum, Minneapolis, MN, Leonard Keith Samuels, Berger Singerman LLP, Fort Lauderdale, FL, Jonathan Faust Claussen, Berger Singerman, Boca Raton, FL, for Plaintiff.

Keith Alan Schafer, Chikovsky, Schafer, P.A., Boca Raton, FL, for Defendants.

### Order Adopting Report and Recommendation and Supplemental Report and Recommendation

ROBERT N. SCOLA, JR., District Judge.

The Court referred Plaintiff Winmark Corporation's (Winmark) Motion for Preliminary Injunction to United States Magistrate Judge Alicia O. Valle for a report and recommendation. (ECF Nos. 11, 13.) On June 12, 2014, Magistrate Judge Valle issued a Report, recommending that this Court grant in part and deny in part the Motion for Preliminary Injunction. (Report of Magistrate, ECF No. 44.) On June 23, 2014, Magistrate Judge Valle issued a Supplemental Report, recommending that the Court order Winmark post a $10,000 security bond should it adopt the Report. (ECF No. 51.) No party has filed an objection to either the Report or the Supplemental Report, and the time to do so has passed.

The Court has considered the Report and the Supplemental Report and finds them both cogent and compelling. *See* 28 U.S.C. § 636(b)(1) (noting that a district judge need only conduct a *de novo* review of "those portions of the report or specified proposed findings or recommendations to which objection is made.") The Court **affirms and adopts** the Report (ECF No. 44) and the Supplemental Report (ECF No. 51.) The Court **grants in part and denies in part** Winmark's Motion for Preliminary Injunction (ECF No. 11), and **orders** that

1. Until July 10, 2015, Defendants Marlin Geimer and Brenoby Sports, Inc. are enjoined on their own account or as an employee, consultant, partner, officer, director, or shareholder of any other person, firm, entity, partnership or corporation from owning, operating, leasing, franchising, conducting, engaging in, being connected with, having any interest in, or assisting any person or entity engaged in any sporting goods business that is located at 12181 Taft Street, Pembroke Pines, Florida (the Franchised Location) or within an eight mile radius of the Franchised Location or any Play It Again Sports store;

2. Defendants Marlin Geimer and Brenoby Sports, Inc. are enjoined from further involvement or affiliation with the Play or Trade Sport store

operating at the Franchised Location and are ordered to abide by the terms of the non-compete agreement and the termination requirements of the Franchise Agreement, ¶¶ 17, 18A, and 18B. While Marlin Geimer is permitted to receive the sale price of the store to Jorge Bocca, Geimer is expressly prohibited from receiving any future percentage payments or revenues from sales made at Play or Trade Sport or any store operating at the Franchised Location in violation of ¶ 18B of the Franchise Agreement;

3. The Court denies Winmark's request for a mandatory injunction requiring that Marlin Geimer and Brenoby Sports, Inc. submit to an audit;

4. The Court denies Winmark's request to enjoin non-parties Jesse Geimer, Rebecca Cann, PO Sport, Jorge Bocca, or Play or Trade Sport;

5. The Court denies Winmark's request for attorneys' fees for pursuing the preliminary injunction. Winmark may seek attorneys' fees at the conclusion of this litigation under the terms of the Franchise Agreement;

6. The Court orders Winmark to provide notice to all parties of this Order, the Report, and the Supplemental Report, as well as any subsequent injunction, as required by Rule 65(d)(2) of the Federal Rules of Civil Procedure; and

7. Winmark is required to post a security bond in the amount of $10,000.[1]

1. The Court notes that, in anticipation of this Order, Winmark has already posted the required bond.

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ALICIA O. VALLE, United States Magistrate Judge.

THIS CAUSE came before the Court upon Plaintiff Winmark Corporation's ("Winmark") Motion for Preliminary Injunction (ECF No. 11). The matter was referred to the undersigned by United States District Judge Robert N. Scola, Jr. pursuant to 28 U.S.C. § 636(b)(1)(B) (ECF No. 13). The undersigned has reviewed the filings and held an evidentiary hearing on the matter on May 1, 2014. For the reasons stated below, the undersigned respectfully recommends that the Motion for Preliminary Injunction be **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

Plaintiff Winmark is a Minnesota corporation whose business includes franchising a chain of retail sporting goods stores that operate under the name Play It Again Sports. Generally, Play It Again Sports stores specialize in buying and selling new and used sporting goods and apparel to consumers. Defendants, Brenoby Sports, Inc. ("Brenoby Sports") and Marlin Geimer (collectively, "Defendants") first operated a Play It Again Sports store in Hollywood, Florida in 1994. Defendants then executed a renewal franchise agreement in 2004 (the "Franchise Agreement") to continue to operate a Play It Again Sports store, which relocated to 12181 Taft Street, Pembroke Pines, Florida (the "Franchised Location"). Pursuant to the Franchise Agreement, Defendants were required to remit 4% of all gross sales to Winmark in

exchange for the right to operate the only Play It Again Sports store in a designated area that covered most of Pembroke Pines. Further, the Franchise Agreement contained two non-compete clauses that prohibited Defendants from competing with the Play It Again Sports store during the Franchise Agreement and for one year after its termination.

On December 3, 2013, Winmark terminated the Franchise Agreement based upon its belief that Defendants had failed to remit to Winmark 4% of Defendants' gross sales and for Defendants' repeated refusal to submit to an audit as required under the Franchise Agreement. On December 12, 2013, Winmark initiated the instant proceeding alleging that Defendants continue to operate a competing store that specializes in buying and selling new and used sporting goods at the Franchised Location. *See* (ECF No. 1 at 8).

Presently before the Court is Winmark's Motion for Preliminary Injunction. In the motion, Winmark seeks three forms of relief from the Court: (i) an injunction against Defendants, their agents, servants, employees and all persons acting in concert or participation with them, from engaging in or having any connection with any sporting goods business pursuant to the non-compete covenant in the Franchise Agreement;[1] (ii) an injunction against Defendants and all those acting in concert with them from any further use of Winmark's proprietary computer software; and (iii) an order requiring Defendants to submit to an audit consistent with the provisions of the Franchise Agreement. *See* (ECF No. 11 at 2). Lastly, Plaintiff also

seeks to recover its costs and attorneys' fees in connection with this motion. *Id.*

## II. *FINDINGS OF FACT*

■ The facts referenced herein are derived from Winmark's Motion for Preliminary Injunction and attached affidavits (ECF No. 11), Defendants' Response to the motion and attached affidavits (ECF Nos. 26, 27, 28), Winmark's Reply (ECF No. 29), and the testimony and documentary evidence presented at the May 1, 2014 hearing. At the preliminary injunctive stage, the court may "rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995) (internal citation omitted).

### A. Parties

1. Winmark franchises various brands, including a nationwide chain of retail sporting goods stores that operate under the name Play It Again Sports. Generally, these stores buy and sell new and used sporting goods. Winmark has been franchising Play It Again Sports for approximately 25 years and there are 300 Play It Again Sports stores in the United States and Canada. Winmark spends a significant amount of time, money, and effort to advertise and market Play It Again Sports. In 2013, for example, Winmark spent more than $300,000 on internal and external marketing for the Play It Again Sports brand. *See* Patrick Quinn Declaration (ECF No. 11–2 at ¶¶ 1, 2); Quinn Testimony.[2]

---

1. The non-parties that Winmark seeks to enjoin are Jesse Geimer, Rebecca Cann, PO Sport, Inc. and was expanded at the May 1st hearing to specifically include the individuals or businesses currently operating a sporting goods store at the Franchised Location.

2. All testimony and exhibits refer to evidence presented to the Court during the May 1, 2014 hearing.

2. Play It Again Sports stores have established brand standards and a support structure detailed in its standard franchise agreement. The standard franchise agreement dictates how any franchise store should look and how it should be operated. Pla. Ex. 1, ¶ 8; Quinn Testimony.

3. Play It Again Sports stores utilize Winmark's Data Recycling System ("DRS") point of sale and inventory management software to run its business. Winmark developed the DRS software over several years and at great expense. The DRS software contains detailed historical information on the prices at which items have been purchased and sold, inventory management reports, category and sub-category performance, gross margins, and other data to help operate the stores. The DRS software generates a unique price tag for all items entered into the system that allows tracking of the item and also generates receipts for customers. *See* Quinn Declaration (ECF No. 11–2, ¶ 4); Quinn Testimony. .

4. Defendants and non-party Paul Barosh originally opened a Play It Again Sports store in Hollywood, Florida in 1994. The store relocated to the Franchised Location in 2004. Barosh was not a party to the Franchise Agreement in 2004. Quinn Testimony; Geimer Testimony.

5. According to Geimer and Florida Department of State, Division of Corporations records, Brenoby Sports is a dissolved corporation. Geimer testified that he was an owner of Brenoby Sports.

## B. The Franchise Agreement

6. Effective January 6, 2004, Winmark entered into the Franchise Agreement with Defendant Brenoby Sports, the Franchisee, for the operation of a Play It Again Sports store at the Franchised Location. Unfortunately, the record is muddied by what appears to be two different versions of the Franchise Agreement: one in Plaintiff's possession; the other in Defendant Geimer's possession. *See* Pla. Ex. 1 (ECF No. 11–3 at 1); Def. Ex. 1.

7. Plaintiff's version of the Franchise Agreement lists the Franchised Location as 12181 Taft Street, Pembroke Pines, Florida 33026, where the store was located from 2004–2013. Pla. Ex. 1 at 1. Defendants' version of the Franchise Agreement lists the Franchised Location as 4919A Sheridan Street, Hollywood, Florida 33021, where the store was located from 1994–2004. Def. Ex. 1 at 1.

8. Plaintiff's version of the Franchise Agreement contains a Personal Guaranty signed by Marlin Geimer in which Geimer agrees to be personally bound to each provision in the agreement. *See* Pla. Ex. 1 at 35–36. In Defendants' version, however, portions of the Personal Guaranty that would apply to Marlin Geimer are stricken with red ink. *See* Def. Ex. 1 (ECF No. 27 at 2).[3]

9. In Plaintiff's version of the Franchise Agreement, Defendants were required to pay to Winmark a continuing fee of 4% of the store's gross sales. Pla. Ex. 1, ¶ 5A. In Defendants' version, Defendants were required to pay Winmark a

---

**3.** Quinn testified that the first time he had ever seen a copy of the Franchise Agreement with terms stricken from the Personal Guaranty was in Defendants' Response to Plaintiff's Motion for Preliminary Injunction. Quinn further testified that he had never seen a franchise agreement between Winmark and any franchisee in which Winmark permitted the franchisee to strike-out provisions of the Personal Guaranty. He also stated that Geimer had never in the past mentioned any concern about being bound to the Franchise Agreement.

continuing fee of 5% of its gross sales. Def. Ex. 1, ¶ 5A

10. Quinn testified that "gross sales" encompasses all sales made at the Franchised Location, including internet sales. He also testified that it is common for Winmark franchisees to pay 5% of gross sales to Winmark during the initial franchise term, but that amount is reduced to 4% during any renewal term.

11. Upon cross-examination, Geimer testified that the initial 1994 franchise agreement required him to pay 5% of all sales to Winmark, and that the 2004 renewal Franchise Agreement required him to pay 4%. Geimer agreed that it was preferable to pay 4% of all "gross sales" to Winmark, as opposed to paying 5%.

12. Paragraph 12C is the same in both versions of the Franchise Agreement. It provides Winmark the right to review and audit Defendants' financial books and records and requires Defendants to pay the costs and expenses of the audit if the auditor determines that royalties have been underpaid by more than 2%. Pla. Ex. 1, ¶ 12C; Def. Ex. 1, ¶ 12C.

13. Both versions of the Franchise Agreement include an identical Computer Software License Agreement ("License Agreement"). The License Agreement provides that termination of the Franchise Agreement ends the Franchisee's license to use Winmark's proprietary DRS software. It further requires the Franchisee to destroy or return to Winmark all copies of the DRS software. *See* Ex. B to Pla. Ex. 1; Ex. B to Def. Ex. 1.

14. Both versions of the Franchise Agreement contain two identical non-compete provisions, one that is applicable during the term of the Franchise Agreement ("in-term non-compete") and one that is applicable upon termination ("post-termination non-compete"). Specifically, Para-

graphs 18A and 18B provide, in pertinent part:

*FRANCHISEE'S COVENANTS NOT TO COMPETE*

 A. *During Term.* Franchisee (and all Personal Guarantors and owners of all or part of Franchisee) will not, during the term of this Agreement, on their own account or as an employee, consultant, partner, officer, director, or shareholder of any other person, firm, entity, partnership or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in, or assist any person or entity engaged in any other sporting goods business, except with Franchisor's prior written consent.

 B. *After Termination.* Franchisee (and all Personal Guarantors and owners of all or part of Franchisee) will not, for a period of one (1) year after this Agreement expires or is terminated (except for a termination as a result of Franchisor's breach), on their own account or as an employee, consultant, partner, officer, director, or shareholder of any other person, firm, entity, partnership, or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any sporting goods business which is located at the Franchised Location or within an eight (8) mile radius of the Franchised Location or any Play It Again Sports Store. Franchisee expressly agrees that the one (1) year period and the eight (8) mile radius are the reasonable and necessary time and distance need-

ed to protect Franchisor if this Agreement expires or is terminated for any reason.

*Id.* at 18–19.

15. The non-compete provisions in both versions of the Franchise Agreement apply to "all Personal Guarantors *and owners* of all or part of Franchisee." *See* Pla. Ex. 1, ¶¶ 18A, 18B; Def. Ex. 1, ¶¶ 18A, 18B. (emphasis added).

16. Although Defendant Geimer denies being bound by the Personal Guaranty, Geimer testified that he was an owner of Brenoby Sports. Thus, the Court finds that because Geimer was an owner of Brenoby Sports, he is bound by the covenant not to compete. Therefore, the Court need not decide whether Geimer is also bound as a personal guarantor.[4]

### C. Termination of the Franchise Agreement

17. In the spring of 2013, Winmark was informed by one of its sporting goods vendors that Defendants might be violating the in-term non-compete covenant in Paragraph 18A of the Franchise Agreement through internet sales. Based on this information, Winmark investigated a business on Amazon.com called Purely Outstanding Sports, and an Ebay.com sporting goods store under the name Gencann Sports. Quinn Decl. ¶ 5; Quinn Testimony.

18. In 2004, Geimer incorporated a business named P.O. Sports, Inc. Geimer was the officer, director and registered

agent of P.O. Sports, Inc. until it was administratively dissolved in 2009. *See* Harmon Decl., (ECF No. 11–4 at 1–2).

19. On May 20, 2013, Winmark sent a letter to Defendants informing them that their online sales through Purely Outstanding Sports and Gencann Sports violated the in-term non-compete provision and constituted a default under the Franchise Agreement. Winmark demanded that Defendants cease and desist from the unlawful competitive activities. Winmark also demanded that Defendants submit to an audit, as authorized by Paragraph 12C of the Franchise Agreement. *See* Pla. Ex. 6.

20. Defendant Geimer responded to the May 20, 2013 default letter by stating:

Dear Pat [Quinn],

As per your letter dated May 20th 2013, I agree to your terms and will and will comply to the requests outlined in your letter. [sic]

My son's Amazon account Purely Outstanding Sports is being shutdown as I write this to you and should be complete by tomorrow. He set it up on his own to make some extra money on the side while attending college and working in the store. I thought it was "no big deal", I obviously was wrong and apologize.... [sic]

As for Ebay & Gencann Sports, I have no vested interest at all. It's associated with a former Play It Again Franchisee Cory Lockerbe (sic) a guy named Beck and couple of women whose names I

---

4. The Court notes, however, that the evidence supports the conclusion that Plaintiff's version of the agreement is the binding agreement. As previously stated, Plaintiff's version of the agreement references the 2004–2013 Taft Street location, and Defendants' version references the 1994–2004 Sheridan Street location. Plaintiff's version includes a 4% remittance to Winmark of all gross sales, and Defendants' version contains the higher 5%

figure to be paid to Winmark. These differences would indicate that Plaintiff's version of the agreement was executed subsequent to Defendants' version. Thus, pursuant to the merger clause in each Franchise Agreement, it would appear that Plaintiff's version is the binding agreement and "supersedes and terminates any prior oral or written understandings [between the parties]." *Id.* at ¶ 20G.

don't know in a nearby city called Sunrise here in Florida. My son knows someone who works there and we have shipped some large items through UPS for them and also provided receipts, for Warranty purposes for $10 apiece on and off for approximately a year and a half, which of course we will stop immediately.

Geimer does not deny that he drafted and sent the May 20, 2013 email response. Geimer does, however, disagree with Plaintiff's interpretation of his response, and argues that it does not constitute an admission that he violated the Franchise Agreement. *See* Pla. Ex. 7; Geimer Testimony.

21. Winmark replied to Geimer's response, requiring that Defendants submit to an audit for the period during which the online sales had taken place. *See* Pla. Ex. 12.

22. Despite Geimer's apparent initial willingness to cooperate in the audit process, he delayed the audit for several months. Finally, on October 24, 2013, Winmark wrote to Geimer requesting that the audit take place on December 3 and 4, 2013, and stated "[p]lease note that if you fail to comply with any of the aforementioned requirements, Winmark will move forward with the immediate termination or non-renewal of your Franchise Agreement (with no opportunity to cure)." *Id.* at 1.

23. On December 2, 2013, one day before the long-scheduled audit, Geimer wrote an email to Winmark's pre-selected auditor cancelling the December 3, 2013 audit, and requesting an additional extension. Pla. Ex. 13 at 1–2.

24. The next day, on December 3, 2013, Winmark sent a letter to Geimer terminating the Franchise Agreement and demanding that Defendants discontinue any further operation of the Play It Again Sports store at the Franchised Location. *See* Pla. Ex. 15; Quinn Testimony.

### D. Post–Termination Events

25. After the termination of the Franchise Agreement, Patrick Quinn and Patrick Cunningham, who is a Field Operations Manager for Play It Again Sports, visited Defendants' former Play It Again Sports store at the Franchised Location. Each testified that the Franchised Location continues to operate as a sporting goods store that buys and sells new and used sporting goods and continues to use Winmark's proprietary DRS software as part of its operations.

26. More specifically, Cunningham testified that on February 25, 2014, he visited the former Play It Again Sports store at the Franchised Location and found that the store now operates by the name Play or Trade Sport ("Play or Trade Sport"). During his visit, Cunningham obtained a business card from Play or Trade Sport. The business card reads "Play or Trade Sport" and Jesse Geimer, Defendant Geimer's college-aged son, is listed as a co-manager. *See* Pla. Ex. 22. The business card is substantially similar to the pre-termination Play It Again Sports business card. *Id.;* Pla. Ex. 23.

27. Cunningham further testified that the signage at the store reads "Play or Trade Sport" and that the store operates exactly as a Play It Again Sports store would operate. During his visit, Cunningham purchased a black Easton sports wristband, which Plaintiff introduced into evidence. Cunningham explained how both the price tag and the customer receipt for the Easton wristband confirm the use of Winmark's proprietary DRS software. For example, the price tag included product identification numbers that would be processed and printed by DRS. The customer receipt also included information that indicated to Cunningham that the

DRS software was still in use at Play or Trade Sport. Cunningham Decl. ¶ 3, Ex. 2 (ECF No. 11–7 at 2); *see also* Pla. Exs. 21, 24.

28. Similarly, Quinn visited Play or Trade Sport on April 30, 2014. Quinn testified that he found numerous product tags that had been labeled in January, February, and March of 2014 using the DRS software, well after Defendants were required to stop using the DRS software and return it to Winmark or destroy it pursuant to the Franchise Agreement. Quinn further testified that he searched the internet and noted brand confusion between Play It Again Sports at the Franchised Location, and the new Play or Trade Sport store.

29. Defendant Geimer testified that he had personally installed the Play or Trade Sport sign after receiving the December 3, 2013 termination letter from Winmark. Geimer stated that he initially planned to sell the store assets to his girlfriend, Rebecca Cann, who was going to operate the store through a company named PO Sport, Inc.

30. Cann incorporated PO Sport, Inc. on December 3, 2013, the same day that Winmark sent Geimer a notice of termination of the Franchise Agreement. *See* Harmon Decl. (ECF 11–4 at 1).[5]

31. Rebecca Cann also testified at the hearing. Cann testified that although she considered purchasing the Play It Again Sports store assets and operating a sporting goods store at the Franchised Location, she was advised by her attorney not to purchase or operate the store.

32. Cann further testified that she maintains an internet sales business in Sunrise, Florida. She stated, however, that PO Sport, Inc. is a dormant company

that is not competing against Winmark. The Court finds Cann's testimony that PO Sport, Inc. is a dormant company and that Marlin Geimer is not involved in Cann's internet-based sales is credible. In addition, the evidence does not establish that Cann is currently involved with Play or Trade Sport.

33. In December 2013, Marlin Geimer sold the assets of the Play It Again Sports store to an individual named Jorge Bocca. Geimer testified that he has no relation to Bocca, and that Geimer is no longer involved with Play or Trade Sport.

34. Despite his assertion that he is not involved with Play or Trade Sport, Geimer testified that he sold the Play It Again Sports store assets to Bocca pursuant to a written agreement in which he will receive $55,000 and an additional percentage of future sales of Play or Trade Sport. Geimer believed Bocca had a company named SOS Sports, Inc., d/b/a Play or Trade Sport ("SOS Sports").

35. Regarding the sale to Bocca, Geimer testified that he has been paid approximately $20,000 and is owed $35,000, plus a percentage of future sales if the store meets revenue expectations. Despite the Court's repeated inquiries, however, Geimer did not specify the actual percentage or the length of time during which he is entitled to receive a percentage of Play or Trade Sport's sales. In fact, Defendants offered no other evidence to corroborate Geimer's testimony as to the terms of the sale to Bocca.

36. Geimer admitted that his son Jesse continues to co-manage Play or Trade Sport along with a former manager from the Play It Again Sports store. According to Geimer, Bocca does not have a background in retail sporting goods stores and

---

5. PO Sport, Inc., incorporated by Cann, is a different company than P.O. Sports, Inc.,

which was incorporated by Geimer. *See supra* at ¶ 18.

Bocca insisted that Jesse continue to co-manage Play or Trade Sport.

37. Although Defendant Geimer testified that his lawyer drafted a letter to Bocca requiring Play or Trade Sport to stop using Winmark's DRS software, Geimer did not offer this letter into evidence at the hearing. Geimer also testified that after the onset of this litigation, he removed the DRS software from Play or Trade Sport and destroyed it. Defendants offered no other evidence to corroborate Geimer's testimony regarding removal and destruction of the DRS software.

38. Lastly, Winmark did not present evidence that either Bocca or Play or Trade Sport were notified of Winmark's effort to enjoin them from further use of Winmark's DRS software, or to prohibit the operation of the sporting goods store at the Franchised Location. Further, Winmark presented no evidence that it plans to open or operate any Play It Again Sports store in Pembroke Pines, Florida near the Franchised Location. Currently, the closest Play It Again Sports store in Florida to the former Franchised Location is in Coral Springs, Florida, which is approximately 23 miles north of Pembroke Pines.

### III. *LEGAL ANALYSIS*

#### A. General Principles

■ The Court may enter a preliminary injunction if the plaintiff demonstrates by a preponderance of the evidence that: (1) there is a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury exists if an injunction is not granted; (3) the threatened injury to the plaintiff outweighs any harm that an injunction may cause the defendants; and (4) issuing the injunction will not harm the public interest. *See, e.g., Levi Strauss & Co.,* 51 F.3d at 985. A preliminary injunction is an extraordinary

and drastic remedy not to be granted unless the movant clearly satisfies the "burden of persuasion" as to these four elements. *See Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir.2000). The goal of a preliminary injunction is to "protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits." *Long v. Benson,* 383 Fed. Appx. 930, 931 (11th Cir.2010) (internal citations omitted).

■ But the burden of persuasion becomes even greater where the relief requested is a mandatory injunction, as opposed to a prohibitory injunction. *See* Trawick, Fla. Prac. & Proc. § 28:1 (2013–2014 ed.). Where the relief requested is mandatory, i.e., not just enjoining a party from acting but rather requiring some affirmative action, then the movant faces "a particularly heavy burden of persuasion." *FHR TB, LLC v. TB Isle Resort, LP.,* 865 F.Supp.2d 1172, 1192 (S.D.Fla.2011) (Goodman, Mag. J.); *see also Caron Found. of Florida, Inc. v. City of Delray Beach,* 879 F.Supp.2d 1353, 1360 (S.D.Fla. 2012) (Dimitrouleas, J.) (reiterating that a mandatory injunction should not be granted "except in rare circumstances in which the facts and law are clearly in favor of the moving party").

The Court will analyze each of the four factors to determine whether an injunction is appropriate in this case.

#### B. Likelihood of Success on the Merits

Winmark argues that Defendants have breached the Franchise Agreement in three material respects: (i) Defendant Geimer's continued association and involvement with the new Play or Trade Sport store at the Franchised Location; (ii) the Play or Trade Sport store's continued use of Winmark's DRS software; and

(iii) Defendants' failure to participate in the contractually required audit. Winmark further argues that Geimer and all persons acting in concert or participation with him, including non-parties PO Sport, Inc., Jesse Geimer, and Rebecca Cann, should be enjoined from operating the Play or Trade Sport store.

### 1) The post-termination non-compete agreement is enforceable against Defendants.

Winmark seeks to enforce the post-termination non-compete provision in the Franchise Agreement. The covenant not to compete applies to the "Franchisee (and all Personal Guarantors and owners of all or part of Franchisee)" and restricts competition for one year from the date of the termination of the Franchise Agreement and within an eight mile radius of the Franchised Location or any Play It Again Sports store. Pla. Ex. 1, ¶ 18B.

The Franchise Agreement was executed on January 6, 2004, and is governed by Florida law. *Id.* at ¶ 20D. Florida Statute § 542.335 governs the validity of restrictive covenants entered into after 1996. *See Proudfoot Consulting Co. v. Gordon,* 576 F.3d 1223, 1231 (11th Cir.2009). The statute makes enforceable restrictive covenants not to compete arising from franchise or license agreements when they are reasonably limited in terms of time and area, and further a legitimate business interest. *See* Fla. Stat. § 542.335(1)(b); *see also Proudfoot,* 576 F.3d at 1231. In the case of a restrictive covenant concerning a former franchisee, the "court shall presume reasonable in time any restraint one year or less in duration." § 542.335(1)(d)(2); *see also Snelling & Snelling, Inc. v. Reynolds,* 140 F.Supp.2d 1314, 1318 (M.D.Fla.2001). As well, "legitimate business interests" include trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, customer goodwill, and extraordinary or specialized training. Fla. Stat. § 542.335(1)(b); *see also Autonation, Inc. v. O'Brien,* 347 F.Supp.2d 1299, 1304 (S.D.Fla.2004) (Dimitrouleas, J.).

Accordingly, the Court determines that the one year and eight mile geographic restrictions in the Franchise Agreement are reasonable in time and scope. These restrictions enable Winmark to have the time and ability to re-license the territory and to protect other franchisees in the system. Restrictions of similar scope have been upheld as valid under Florida law. *See, e.g., Medi–Weightloss Franchising USA, LLC v. Medi–Weightloss Clinic of Boca Raton, LLC,* 11–CV–2437, 2012 WL 260902, at *5 (M.D.Fla. Jan. 3, 2012) (determining 25 mile restriction against franchisee was reasonable under Florida law); *Atomic Tattoos, LLC v. Morgan,* 45 So.3d 63, 65 (Fla. 2d DCA 2010) (granting injunctive relief where defendant violated one year, seven mile restriction of a valid restrictive covenant).

In addition, Winmark has established that the covenant not to compete is necessary to protect its legitimate business interests. Winmark provided confidential business information to Defendants, including the DRS software and instructions for how the store must be operated. Winmark has also established a legitimate business interest in protecting its franchise system, customer goodwill, and existing franchise relationships. Moreover, Defendants do not contest that Winmark seeks to protect its legitimate business interests, nor do they challenge the reasonableness of the time limitation or geographic restriction. Thus, the Court determines that the restrictive covenant outlined in Paragraph 18B of the Franchise Agreement is

enforceable against both Brenoby Sports as Franchisee and Marlin Geimer as an owner of Brenoby Sports.

**2) Defendant Geimer's continued affiliation with Play or Trade Sport violates the post-termination non-compete agreement.**

■ Although Defendant Geimer testified that he no longer visits Play or Trade Sport, the evidence establishes that he has a continued personal and financial interest in the store. For example, Geimer testified that he personally installed the Play or Trade Sport sign on the store's exterior. Geimer also testified that his son Jesse currently co-manages the Play or Trade Sport store. Recently, Jesse informed Defendant Geimer that the store was losing employees. In this regard, Defendant Geimer testified that "we lost two more today," a statement suggesting his continued interest and identification with the Play or Trade Sport store. Most importantly, Geimer admitted that he has a continued financial interest in the Play or Trade Sport store's success because he expects to receive an undisclosed percentage of the store's sales if it meets certain revenue expectations. Accordingly, even if Geimer is not personally visiting or working at the store, his testimony confirms that he has a personal and financial interest in the Play or Trade Sport store's success and continues to monitor the store's business. Accordingly, the Court determines that Winmark is likely to succeed on its claim that Geimer is violating the post-termination restrictive covenant, which does not permit Geimer to "conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any sporting goods business which is located at the Franchised Location." Pla. Ex. 1, ¶ 18B.

**3) Winmark has established that Defendants did not properly return or destroy the DRS software following termination of the Franchise Agreement.**

■ The Franchise Agreement provides that upon termination, the franchisee is required to "comply with all post-termination obligations under the Software License Agreement, including the return of all copies of Franchisor's proprietary software, . . . or discontinue using all aspects of any third party software that is proprietary to Franchisor." Pla. Ex. 1 at ¶ 17A; *see also* Ex. B to Ex. 1, ¶ 3B ("Licensee agrees to immediately return to Winmark all copies of the Software, or to destroy all Software.").

Winmark has provided evidence that the Play or Trade Sport store continues to utilize Winmark's DRS software. Winmark's representatives visited the Play or Trade Sport store location and obtained merchandise (the black Easton wristband) that appeared to have been created using Winmark's DRS software. As recently as April 30, 2014, Winmark representatives identified items in the store that appeared to have been marked with tags generated using DRS software in January, February, and March of 2014.

Although Geimer testified that his lawyer wrote a letter to the new owner Jorge Bocca requiring Bocca to cease and desist from any further use of the DRS software, Geimer offered no evidence to corroborate his testimony. The evidence demonstrates that the Play or Trade Sport store continues to use the DRS software to generate sales tags and receipts. Accordingly, Winmark has established a likelihood of success that Defendants have violated ¶ 17A of the Franchise Agreement by failing to return or destroy the DRS software upon the termination of the Franchise Agreement.

**4) Winmark has demonstrated a likelihood of success that Defendants violated the audit requirement in the Franchise Agreement.**

██ Paragraph 12C of the Franchise Agreement provides that "Franchisee will make all of its financial books and records ... available to Franchisor or its designated representative at all reasonable times for review and audit by Franchisor or its designee."

As early as May 2013, Winmark had reason to believe that Defendants were operating competing online stores and failing to remit to Winmark the required 4% payment for all gross sales. Accordingly, Winmark demanded an audit pursuant to Paragraph 12C of the Franchise Agreement. Winmark contacted Defendants on May 20, 2013, June 5, 2013, and October 24, 2013 to request that an audit be performed immediately. *See* Pla. Exs. 7, 9, 12. After a series of delays, Defendant Geimer notified the auditor that he would not be ready for the audit on the scheduled date of December 3, 2013. Defendants then terminated the Franchise Agreement.

Upon consideration of the evidence, the Court finds that Plaintiff has demonstrated a likelihood of success in establishing its claim that Defendants violated Paragraph 12C of the Franchise Agreement.

**5) Winmark has not met its burden to establish a likelihood of success against the non-parties to this action.**

Under Florida law, a restrictive covenant is not enforceable "unless it is set forth in a writing signed by the person against whom enforcement is sought." Fla. Stat. § 542.335(1)(a); *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC*, 10–CV–978–J, 2013 WL 3815595, at *4 (M.D.Fla. July 22, 2013) (denying request to enforce restrictive covenant against party that had not signed the agreement); *see also Coastal Loading Inc. v. Tile Roof Loading, Inc.*, 908 So.2d 609, 612 (Fla. 2d DCA 2005) (limiting restrictive covenant to terms agreed to in writing signed by the parties).

In its Motion for Preliminary Injunction, Winmark argues that an injunction is appropriate against "Defendants, PO Sport, Cann, Jesse Geimer, and all others affiliated or associated with Defendants from continued operation of or involvement with a sporting goods business at the [Franchised Location]." (ECF No. 11–1 at 15). At the evidentiary hearing, Winmark reiterated its request that the Court enjoin the current owner of Play or Trade Sport from any further operation of a sporting goods store at the Franchised Location.

██ To support its request to enjoin non-parties to the instant proceeding, Winmark cites to cases in which the court enjoined competing businesses being operated by spouses, family members, or shell corporations of the person that signed the non-compete agreement. *See, e.g., West Shore Rest. Corp. v. Turk*, 101 So.2d 123 (Fla.1958); *North Am. Prods. Corp. v. Moore*, 196 F.Supp.2d 1217 (M.D.Fla. 2002). The Court can enjoin non-parties to the non-compete agreement, such as a family member of the signator or an alter ego corporation, where the nonparty is either under the signator's control or otherwise being used to aid or abet the signator in violating the non-compete clause. *See, e.g., Leighton v. First Universal Lending, LLC*, 925 So.2d 462, 464–65 (Fla. 4th DCA 2006); *Dad's Properties, Inc. v. Lucas*, 545 So.2d 926 (Fla. 2d DCA 1989).

**i. Non–Parties Rebecca Cann, PO Sport, Inc., and Jesse Geimer**

██ The evidence does not support a finding that Rebecca Cann, Jesse Geimer, or Cann's company PO Sport, Inc., are

operating Play or Trade Sport or are otherwise aiding and abetting Defendant Geimer in violating the non-compete agreement. Likewise, the evidence does not support a finding that Play or Trade Sport is merely an alter ego of the Defendants or is operating under Defendants' control. While Jesse Geimer is listed as a co-manager of Play or Trade Sport, Marlin Geimer testified that Jesse Geimer does not own Play or Trade Sport and is merely an employee. Rebecca Cann further testified that she has no involvement with Play or Trade Sport and that PO Sport, Inc. is a dormant company. Finally, neither Cann nor Jesse Geimer are personal guarantors or owners of Brenoby Sport, and are therefore not bound by the non-compete covenant in the Franchise Agreement.

### ii. Non–Parties Jorge Bocca and SOS Sport d/b/a Play or Trade Sport

 Similarly, Winmark has not established that non-parties Jorge Bocca and SOS Sport are an alter ego for Geimer to secretly operate Play or Trade Sport, or that these non-parties are under Geimer's control. Geimer testified that he sold the assets of his franchise to Bocca, who is not a close friend or relative. While Geimer's testimony that he has no affiliation to Play or Trade Sport is belied by his financial incentive for the store's success, Winmark has not established that Play or Trade Sport is under Geimer's control, a corporate fiction, or otherwise being used to aid

and abet Geimer in violating the non-compete agreement.[6]

Finally, even if Winmark had established that Play or Trade Sport is being operated by Defendants, the Court would not be able to enter an injunction unless the non-parties received notice of Winmark's claim and had an opportunity to be heard. For example, in *Leighton v. First Universal Lending, LLC,* the trial court issued an injunction against both a former loan officer of a lending company, and the former loan officer's company, which he formed following his departure from the lending company. 925 So.2d 462, 463 (Fla. 4th DCA 2006). The appellate court reversed the injunction as to the company because the company was not a named party to the lawsuit and had not been served prior to the injunction hearing. *Id.* at 465. The court noted that there was no evidence that the new company was an alter ego of the former employee, and reiterated that an injunction "cannot bind parties who are not before the court." *Id.; see also Sheoah Highlands Inc. v. Daugherty,* 837 So.2d 579, 583 (Fla. 5th DCA 2003) (reversing injunction made against parties that would affect the right of non-parties that were not brought before the court). While Defendants Geimer and Brenoby Sports had notice of the injunction and had counsel during the May 1st hearing,[7] Winmark did not establish that it provided notice of its request for an injunction to Play or Trade Sport or Jorge

---

**6.** To the extent that Winmark believes that Play or Trade Sport is wrongfully utilizing Winmark's DRS software, then Winmark may of course consider legal action against Play or Trade Sport if it fails to desist from using the software.

**7.** On May 30, 2014, the Court entered an Order quashing service of process as to Defendant Brenoby Sports. *See* (ECF No. 43). However, unlike the loan company in *Univer-*

*sal Lending,* which was not a named party to the lawsuit, Brenoby Sports is a named party to the instant lawsuit, and had both representation by counsel at the May 1st hearing and an opportunity to be heard. Thus, while the non-parties did not have notice of Winmark's request for injunctive relief, Defendant Brenoby did have notice and is subject to this Report and Recommendation pursuant to Federal Rule of Civil Procedure 65(d)(2).

Bocca, who did not have an opportunity to appear before the Court.

For these reasons, the Court determines that Winmark has not established a likelihood of success against the non-parties, nor have they been given an opportunity to be heard. Consequently, the Court need not consider the remaining three factors as they pertain to the non-parties, and will not enjoin the non-parties from being involved with or operating Play or Trade Sport.

## C. Irreparable Harm

■■■■ To demonstrate irreparable harm, a movant must show "that the injury cannot be undone through monetary remedies." *Anago Franchising, Inc. v. C.H.M.I., Inc.,* No. 09–60713–CIV, 2009 WL 5176548, at *11 (S.D.Fla. Dec. 21, 2009). The irreparable injury claimed "must be neither remote nor speculative, but actual and imminent." *Id.* citing (*Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir.2000)). Under Florida law, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." *See* Fla. Stat. § 542.335(1)(j); *see also Proudfoot,* 576 F.3d at 1231.

**1. Winmark has established that it faces irreparable harm should Defendants continue to violate the non-compete provision of the Franchise Agreement.**

■■■■ Winmark has established that Defendants are in violation of the enforceable post-termination non-compete agreement and thus are entitled to the presumption of irreparable injury. Defendants have not attempted to rebut the presumption of irreparable injury to Winmark. Therefore, the Court may presume Winmark suffers and will continue to suffer irreparable injury due to Defendants' ongoing violations of the non-compete agreement.

In addition to the presumption, Winmark has established legitimate business interests that support a finding of irreparable harm. Mr. Quinn testified that Winmark has spent a significant amount of time and money for the promotion and goodwill associated with Play It Again Sports. Quinn also testified concerning brand confusion when searching the internet for Play It Again Sports and Play or Trade Sport. Accordingly, the Court finds that Winmark has established irreparable harm resulting from Defendants' continued violation of the non-compete agreement.

**2. Winmark has not established irreparable harm if the Court does not order an audit.**

■■■■ Along with enjoining Defendants and non-parties from continued violations of the non-compete agreement, Winmark also seeks a Court order to require Defendants to submit to an audit pursuant to the provisions of the Franchise Agreement. Requiring Defendants to submit to an audit amounts to a mandatory injunction that places a higher burden of persuasion upon Winmark. *See Caron Foundation of Florida,* 879 F.Supp.2d at 1360.

■■■■ When an injury is compensable through money damages, the harm is, by definition, not irreparable. *See Gulf Coast Produce, Inc. v. Am. Growers, Inc.,* 07–80633 CIV, 2007 WL 2302109, at *2 (S.D.Fla. Aug. 8, 2007) (Marra, J.) (denying injunctive relief where plaintiff had adequate remedy at law in money damages); *FHR TB,* 865 F.Supp.2d at 1212 (same). Although Winmark has established a likelihood of success on the merits that Defendants violated the Franchise Agreement by failing to submit to an audit, Winmark has not established that it will be irreparably harmed if the Court does not require the audit to occur at this time.

■ Winmark argues that without an audit it is unable to determine the amount of royalties and other fees it is owed as a result of Defendants' violation of the in-term non-compete agreement. *See* (ECF No. 11–1 at 16, ¶ 18A). However, Winmark can remedy this situation through discovery in the instant case. In addition, Winmark has an adequate remedy in the form of monetary damages should it prevail on its claims that Defendants' violated the in-term provisions of the Franchise Agreement by withholding payments and failing to perform the contractually-required audit. As to Winmark's concern that it will have difficulty ascertaining damages without an immediate audit, "conjecture about a possibility of difficulties with damage computations is inadequate to support an injunction before trial." *Northeastern Florida Chapter of the Assoc. of General Contractors v. City of Jacksonville, Florida*, 896 F.2d 1283, 1286 (11th Cir.1990).

The Court finds that Winmark has not satisfied the heightened burden required for the issuance of a mandatory injunction, and thus will not require Defendants to submit to an audit at this time.

### D. Balance of Potential Harms

To grant injunctive relief, the Court must weigh the potential harm to both Plaintiff and Defendants. Generally, a franchisee that has breached the terms of its franchise agreement cannot then complain of harm from an injunction preventing further violations of the agreement. *See Dunkin' Donuts Franchised Restaurants LLC v. D & D Donuts, Inc.*, 566 F.Supp.2d 1350, 1361 (M.D.Fla.2008) (entering preliminary injunction against franchisee despite the financial losses that might result due to injunctive relief); *see also Burger King Corp. v. Majeed*, 805 F.Supp. 994, 1005 (S.D.Fla.1992) (same).

Winmark has established that Defendants' violation of the post-termination non-compete agreement will impair its goodwill and reputation in the community, impair its ability to maintain a market presence, and erode the pattern and practice of uniform contract interpretation and performance within Winmark's franchise system. Compared to this potential harm, Defendants fail to show any harm if the Court enjoins them from any further participation with the Play or Trade Sport store. Although Defendants would be harmed by not continuing to receive the percentage of sales from the Play or Trade Sport store, "[any] harm suffered by [Defendants] was brought about by their own actions in refusing to [abide by] their contractual obligations" to Winmark. *Majeed*, 805 F.Supp. at 1006. Thus, the hardship Winmark would suffer without a preliminary injunction outweighs Defendants' hardship resulting from a preliminary injunction.

### E. Public Interest

■ Public policy in Florida favors enforcement of reasonable covenants not to compete. *See Autonation*, 347 F.Supp.2d at 1308. Along with Florida Statute § 542.335, enforcement of a covenant not to compete protects proprietary business interests and the enforcement of contracts. *Id.; see also Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir.2001).

■ Here, the public interest in the enforcement of contracts weighs in favor of enjoining Defendants from any further violation of the non-compete provision of the Franchise Agreement, or further participation with Play or Trade Sport. Defendants have offered no argument on this point and provide no evidence that enforcement of the non-compete is against public policy.

## F. Bond

The Court may issue a preliminary injunction "only if the movant gives security in an amount that the [C]ourt considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined...." Fed. R.Civ.P. 65(c). The amount of an injunction bond is a matter within the sound discretion of the district court. *See Carillon Importers, Ltd. v. Frank Pesce Int'l Group, Ltd.,* 112 F.3d 1125, 1127 (11th Cir.1997). Although the Court is mindful that the Franchise Agreement states that Winmark could be entitled to an injunction without posting a bond, *see* Pla. Ex. 1 at ¶ 18D, the Court is not bound by this provision. Thus, additional briefing is required for the Court to determine a sufficient security should it later be determined that Geimer or Brenoby Sports have been wrongfully enjoined.

## IV. *CONCLUSION AND RECOMMENDATION*

The undersigned has determined that the post-termination restrictive covenant not to compete is valid and enforceable against the Defendants, and that Defendant Geimer's continued financial interest in the Play or Trade Sport store violates the post-termination non-compete provision in the Franchise Agreement. Accordingly, the Court recommends that Defendants be enjoined from any further violations of the non-compete provision, including having any future financial interest in Play or Trade Sport or SOS Sports during the term of the non-compete agreement. Geimer may receive the $55,000 sales price for the sale of the Play It Again Sports store, which sale does not itself violate the non-compete

agreement. *See Osmo Tec SACV Co. v. Crane Environmental, Inc.,* 884 So.2d 324, 327 (Fla. 2d DCA 2004) (determining that sale of assets was not prohibited by injunction where there was no evidence that the sale of assets was an attempt by the enjoined party to continue to participate in the business at issue). Geimer, however, cannot continue to receive payments based on a percentage of the new store's sales, which would violate the non-compete provision prohibiting "any connection" or "any interest" in a "sporting goods business which is located at the Franchised Location." *See* Pla. Ex. 1, ¶ 18B.

Accordingly, the undersigned recommends that Plaintiff's Motion for Preliminary Injunction should be **GRANTED IN PART** and **DENIED IN PART**. It is recommended that:

1. Defendants Marlin Geimer and Brenoby Sports, Inc. be enjoined for a period of one year from the date that the injunction is effective on their own account or as an employee, consultant, partner, officer, director, or shareholder of any other person, firm, entity, partnership or corporation from owning, operating, leasing, franchising, conducting, engaging in, being connected with, having any interest in or assisting any person or entity engaged in any sporting goods business that is located at the Franchised Location or within an eight mile radius of the Franchised Location or any Play It Again Sports store.[8]

2. Defendants Marlin Geimer and Brenoby Sports, Inc. be enjoined from further involvement or affiliation

---

**8.** Paragraph 18C of the Franchise Agreement establishes that the one year non-competition period set forth in ¶ 18B should be extended and start on the day that the preliminary injunction is issued.

with the Play or Trade Sport store operating at 12181 Taft Street and be ordered to abide by the terms of the non-compete agreement and the termination requirements of the Franchise Agreement, ¶¶ 17; 18A; and 18B. While this permits Geimer to receive the sale price of the store to Jorge Bocca, Geimer is expressly prohibited from receiving any future percentage payments or revenues from sales made at Play or Trade Sport or any store at 12181 Taft Street in violation of ¶ 18B of the Franchise Agreement.

3. The Court deny Winmark's request for a mandatory injunction requiring that Defendants submit to an audit.

4. The Court deny Winmark's request to enjoin non-parties Jesse Geimer, Rebecca Cann, PO Sport, Jorge Bocca, or Play or Trade Sport.

5. The Court deny Winmark's request for attorneys' fees for pursuing the preliminary injunction. Winmark may seek attorneys' fees at the conclusion of this litigation pursuant to the Franchise Agreement.

6. The Court order Winmark to provide notice to all parties of this Report and Recommendation and any subsequent injunction as required by Federal Rule of Civil Procedure 65(d)(2).

By June 19, 2014, the parties are ordered to file supplemental briefs, not to exceed five pages, regarding an appropriate bond pursuant to Federal Rule of Civil Procedure 65(c). The parties shall meet and confer prior to filing their respective briefs. If the parties agree to a bond, then the parties can file a Joint Notice of Stipulated Bond.

The parties may serve and file written objections to this Report and Recommendation with the Honorable Robert N. Scola, Jr., United States District Judge, within fourteen (14) days of being served with a copy. *See* 28 U.S.C. § 636(b)(1)(C). Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b); *see also Thomas v. Arn,* 474 U.S. 140, 152, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**RESPECTFULLY SUBMITTED** in Fort Lauderdale, Florida on June 12, 2014.